**ELECTRONIC LABORATORY SUPPLY COMPANY, INC. and Jack Snyderman, Appellants,**

v.

**Raymond T. CULLEN, Ronald B. Hauben, and Joseph Wolfson.**

No. 92–1145.

United States Court of Appeals, Third Circuit.

Argued Aug. 17, 1992.

Decided Oct. 15, 1992.

Harold E. Kohn, Robert J. LaRocca (Argued), Joanne Zack, Deborah A. Sottosanti, Kohn, Nast & Graf, P.C., Philadelphia, Pa., for appellants.

Patrick W. Kittredge (Argued), Gary M. Marek, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, Pa., for appellees.

799

Before HUTCHINSON, COWEN and WEIS, Circuit Judges.

OPINION OF THE COURT

COWEN, Circuit Judge.

Plaintiff-appellants Electronic Laboratory Supply Co. ("ELSCO") and Jack Snyderman appeal the grant of summary judgment dismissing their claims under section 34(d)(11) of the Lanham Trademark Act, codified as amended at 15 U.S.C. § 1116(d)(11) (1988). The defendant-appellees are three attorneys who allegedly obtained a wrongful *ex parte* seizure of appellants' goods. At issue in this appeal is (1) whether an attorney can be a defendant under section 1116(d)(11), which provides a cause of action for wrongful seizure against the "applicant" for an *ex parte* seizure order; and (2) whether there is aiding and abetting liability under section 1116(d)(11). We conclude that the answer to both questions is no and will affirm the grant of summary judgment.

I.

On appeal of a grant of summary judgment, we must view all facts and all inferences in the light most favorable to the nonmoving party, in this case the plaintiff-appellants. *Clement v. Consolidated Rail Corp.*, 963 F.2d 599, 600 (3d Cir.1992). ELSCO and Snyderman filed the instant law suit to recover damages suffered through an *ex parte* seizure of their inventory and records, which occurred during a prior, related lawsuit between ELSCO and Motorola, Inc. ("Motorola"). Motorola was represented in that action by defendant Raymond Cullen, a partner in the Philadelphia law firm of Morgan, Lewis & Bockius, and by defendants Ronald Hauben and Joseph Wolfson, present or former associates of that firm.

ELSCO is in the business of purchasing scrap electronic parts from manufacturers and smelting them to retrieve the precious and semi-precious metals which they contain. ELSCO makes bullion bars of those metals and sells them to refining compa-

nies. Jack Snyderman is the president of ELSCO.

Motorola is one of the world's largest manufacturers and sellers of electronic equipment and components, including various integrated circuits, discrete semiconductors, and microprocessor units. These items are collectively known as "semiconductor devices." For a variety of reasons, including manufacturing defects and expiration of shelf life, certain Motorola semiconductors do not meet the company's quality control standards and are considered scrap material. In order to protect its reputation and intellectual property rights, Motorola requires the prompt destruction of all of its scrap material to ensure that only high quality semiconductors are sold under the Motorola trade name. Motorola has contracted with over thirty-five different smelting companies worldwide to destroy its scrap material.

From 1980 to 1988, ELSCO contracted with Motorola to purchase Motorola scrap material, remove it from Motorola's facilities, destroy it, and furnish Motorola with certificates of destruction within thirty days of receipt of the material. A few of the semiconductors purchased by ELSCO had the Motorola logo stamped on them. Early in 1988, Motorola discovered that some of its scrap semiconductors were being sold in Hong Kong without the company's authorization. After conducting an investigation, Motorola suspected that ELSCO was the source of those devices. In February of 1988, Claude Wheeler, Motorola's Corporate Manager of Precious Metals Controls, contacted Snyderman and requested his permission to visit ELSCO and conduct an audit of the scrap material purchased from Motorola. Snyderman agreed. On February 25, 1988, Wheeler visited ELSCO and took inventory of the Motorola scrap material. He was given full access to ELSCO's premises and to its books and records. One day later, Wheeler described the results of his audit in an inter-office memorandum, in which he compared the amount of scrap material sold to ELSCO with the amounts of scrap which ELSCO had smelted or still had on its premises. The scrap material sold to ELSCO fell roughly into two categories: copper scrap and steel scrap. Wheeler concluded that ELSCO accounted for 98.05% of the copper scrap and 98.7% of the steel scrap received from Motorola. Wheeler also reported that Charles Rawls, a former ELSCO employee, was fired for theft.

Motorola was not satisfied. On March 9, 1988, Michael Katalinic and Robert Lewis, two Motorola internal security employees, made an unannounced visit to ELSCO to verify the information in Wheeler's audit. Snyderman fully cooperated with them, giving them access to the warehouses containing the Motorola scrap material. None of that material had been moved, concealed, or disturbed since the Wheeler audit. Katalinic and Lewis did not reweigh any of the scrap material.

On March 23, 1988, Motorola filed a complaint against ELSCO and Snyderman in the United States District Court for the Eastern District of Pennsylvania (Civ. No. 88–2452), alleging trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125, patent infringement, RICO, breach of contract, and various common law torts. Accompanying the complaint was Motorola's application for an *ex parte* order for seizure of the Motorola semiconductor devices and various records in ELSCO's possession, pursuant to 15 U.S.C. § 1116(d)(11) and Pennsylvania replevin rules. One of the affidavits supporting the application was that of former ELSCO employee Charles Rawls, who claimed that during his employment in ELSCO's warehouse, ELSCO clandestinely resold 75–80% of the Motorola scrap material and concealed its activities from Motorola inspectors.

The complaint and the application for *ex parte* seizure were prepared by attorneys Cullen, Hauben, and Wolfson. During the *ex parte* proceeding, these attorneys never informed the district court of the following facts: that only 27 days earlier, Motorola performed the audit which accounted for over 98% of the scrap material that it sold to ELSCO, a conclusion obviously inconsistent with the statement in Rawls' affidavit that ELSCO resold 75–80% of that materi-

al; that Rawls was a disgruntled former employee of ELSCO who was fired for stealing scrap material; that Motorola paid Rawls $700 for his time in preparing his affidavit; that ELSCO and Snyderman co-operated fully with the Wheeler audit and the surprise inspection by Katalinic and Lewis, occurring within four weeks of the law suit, and gave them access to whatever ELSCO premises, books, and records they wished to see; and that ELSCO and Snyderman never moved or secreted any scrap material during this period, though they knew of Motorola's investigation.

On March 23, 1988, the district court granted the *ex parte* seizure order. On March 24, the court granted the motion of Morgan, Lewis & Bockius to be appointed substitute custodian of the seized goods. On March 25, the seizure was carried out. Approximately fifteen persons, including two federal marshals, attorney Hauben, and various Motorola and moving van company employees, entered ELSCO's head-quarters in Philadelphia. They seized most of ELSCO's inventory, consisting of hundreds of thousands of pounds of scrap material, and many business records. These items were held for several months in private storage facilities in New Jersey. The *ex parte* seizure caused serious injury to ELSCO's business.

On June 7, 1988, ELSCO filed a complaint against Motorola and its attorneys in the United States District Court for the Eastern District of Pennsylvania (Civ. No. 88–4494), alleging wrongful seizure under the Lanham Act, 15 U.S.C. § 1116(d)(11), antitrust violations, RICO, Rule 11 violations, and various common law torts. The two lawsuits were consolidated. On July 3, 1990, the district court granted summary judgment in favor of ELSCO in the first lawsuit, Civ. No. 88–2452, dismissing Motorola's trademark infringement claims under the Lanham Act. 1990 WL 93983.

Motorola and ELSCO afterward reached a settlement. The district court signed stipulations and orders of dismissal on May 8, 1991, dismissing Motorola's suit against ELSCO (Civ. No. 88–2542) in its entirety, and dismissing ELSCO's suit against Moto-rola (Civ. No. 88–4494). ELSCO's claims against the defendant attorneys Cullen, Hauben, and Wolfson were preserved.

The defendants moved for summary judgment on the grounds that attorneys are not proper defendants under 15 U.S.C. § 1116(d)(11), which only creates a cause of action against the "applicant" for an *ex parte* seizure order. The district court granted their motion on December 30, 1991. *Electronic Lab. Supply Co. v. Cullen,* 782 F.Supp. 1016 (E.D.Pa.1991). ELSCO moved for reconsideration on the grounds that defendants could be liable as aiders and abettors. The district court denied their motion on February 11, 1992. *Electronic Lab. Supply Co. v. Motorola, Inc.,* 785 F.Supp. 67 (E.D.Pa.1992). This appeal followed.

The district court had jurisdiction over this action under 28 U.S.C. § 1331 (1988). We have jurisdiction over the appeal from a final order of the district court under 28 U.S.C. § 1291 (1988). The issues on appeal are whether an attorney is an "applicant" under 15 U.S.C. § 1116(d)(11) and whether there is aiding and abetting liability under § 1116(d)(11). These are purely questions of statutory construction, and our standard of review therefore is plenary. *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 684 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *United States v. Barel,* 939 F.2d 26, 31 (3d Cir.1991).

## II.

The Lanham Trademark Act ("the Act"), as amended in 1984, authorizes a district court to grant an *ex parte* order for the seizure of items involved in the unlawful use of a counterfeit mark, including goods, counterfeit marks, the means of making such marks, and records. 15 U.S.C. § 1116(d)(1)(A) (1988). In light of the extraordinary nature of this remedy, the statute creates a cause of action for wrongful seizure:

> A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the *applicant* for the order under which

such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee....

*Id.* § 1116(d)(11) (emphasis added). This subsection specifically creates a cause of action against the "applicant for the order" for *ex parte* seizure. *Id.* The issue before us is whether the term "applicant" refers only to the party whose mark is allegedly being counterfeited, or whether it also encompasses the party's attorney. This question is one of first impression at the appellate level. The only case to address this issue is *Skierkewiecz v. Gonzalez,* 711 F.Supp. 931, 934 (N.D.Ill.1989), which held that attorneys could be defendants under section 1116(d)(11). Its holding is not supported by any analysis, and we therefore consider it unpersuasive.

■■■■ The starting point for interpretation of a statute is the language of the statute itself. *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842, 852 (1990). The Lanham Act lists the definitions of many of its key terms. *See* 15 U.S.C. § 1127 (1988). The relevant portion reads:

§ 1127. Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context—

....

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

*Id.* By statutory definition, the term "applicant" embraces the "legal representatives" of applicants. We need not decide in this case whether the term "applicant" includes, as a general matter, a party's attorney. Section 1127 provides that its definitions, including its definition of "applicant," shall apply "unless the contrary is

plainly apparent from the context." The language of that clause shows that Congress did not intend for the statutory definition of "applicant," whatever its general meaning, to apply to every provision of the Lanham Act. The narrow issue before us, then, is whether the term "applicant" is used in a context in section 1116(d)(11) which clearly indicates that it does not refer to the attorneys of parties who seek *ex parte* seizure orders.

Section 1116(d)(1)–(10) specifies the rules and procedures for the granting of *ex parte* seizure orders under the Lanham Act, while section 1116(d)(11) provides a cause of action for abuse of that specific remedy. In examining the context in which "applicant" is used in section 1116(d)(11), we will consider all of the provisions governing *ex parte* seizures.

Initially, we note that *ex parte* seizures are available to remedy only one kind of misconduct: violation of 15 U.S.C. § 1114(1)(a) through use of a counterfeit mark. 15 U.S.C. § 1116(d)(1)(A) (1988). Section § 1114(1)(a) provides a civil cause of action against persons who distribute goods through unauthorized use of an imitation of a registered mark likely to deceive the public. *See* 15 U.S.C. § 1114(1)(a) (1988). Congress' apparent purpose in authorizing applications for *ex parte* seizures was to protect the property rights of persons likely to suffer immediate and irreparable harm from such counterfeiting of their goods or marks. The remedy of *ex parte* seizure directly benefits the person who is being injured by the trademark infringement, not his lawyer. The implication is that Congress regarded section 1114(1)(a) plaintiffs, and not their lawyers, as being the applicants for *ex parte* seizure orders.

Further evidence of Congress' intent in using the term "applicant" can be gathered from the conditions that must be met before an application for *ex parte* seizure can be granted:

The court shall not grant such an application unless—

(A) the person obtaining an order under this subsection provides the security de-

termined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection; and

(B) the court finds that it clearly appears from specific facts that—

(i) an order other than an ex parte seizure order is not adequate to achieve the purposes of section 1114 of this title;

. . . .

(iii) the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv) an immediate and irreparable injury will occur if such seizure is not ordered;

. . . .

(vi) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application. . . .

15 U.S.C. § 1116(d)(4) (1988).

Section 1116(d)(4)(A) requires the "person obtaining an order under this subsection" to post a bond to cover damages which may result from a "wrongful seizure or wrongful attempted seizure under this subsection," 15 U.S.C. § 1116(d)(4)(A) (1988), while section 1116(d)(11) provides a cause of action against the "applicant" for wrongful seizure. Because these two subsections are obvious counterparts to one another, we conclude that the terms "person obtaining an order" in section 1116(d)(4)(A) and "applicant" in section 1116(d)(11) refer to the same person. The applicant for the ex parte seizure order must therefore post a security bond. Though it is theoretically possible for any person to pay a bond, Congress must have known that it is a common practice for clients to pay security bonds, while it is an extraordinary (if not unheard of) practice for lawyers to pay for them. The bond requirement implies that Congress did not

consider lawyers to be applicants under the provisions of section 1116(d).

Under section 1116(d)(4)(B)(i), a court cannot grant an ex parte seizure order unless it clearly appears that no other order would "achieve the purposes of section 1114 of this title." Id. § 1116(d)(4)(B)(i). As we discussed above, section 1114 provides a civil cause of action against persons who distribute goods through unauthorized use of an imitation of a registered mark. See 15 U.S.C. § 1114 (1988). The purpose of that section is to protect the property rights of the plaintiff whose trademark is infringed, cf. id. § 1114(2) (limiting "the remedies given to the owner of a right infringed under this chapter"), not the rights of his lawyer. The requirement that an ex parte seizure achieve the purpose of section 1114 implies that Congress regarded the plaintiff whose rights are protected by section 1114, and not his lawyer, as being the only person who applies for the ex parte seizure order.

Under section 1116(d)(4)(B)(iii), a court cannot grant an ex parte seizure order unless it clearly appears that "the applicant is likely to succeed in showing" that the defendant used a counterfeit mark. 15 U.S.C. § 1116(d)(4)(B)(iii) (1988). In common parlance, it is a party who "succeeds" in a litigation, who "shows" something, who bears a burden of proof, or who makes a motion. These actions are carried out by a party (normally the plaintiff) through an attorney. We agree with the district court that the use of the term "applicant" in section 1116(d)(4)(B)(iii) indicates that Congress considered the applicant for the seizure order to be a party, and not a party's attorney.

Under section 1116(d)(4)(B)(iv), a court cannot grant the application unless it clearly appears that "an immediate and irreparable injury will occur if such seizure is not ordered." 15 U.S.C. § 1116(d)(4)(B)(iv) (1988). This subsection does not specify who must suffer the injury, but it is obvious that Congress is referring to the plaintiff whose mark has been counterfeited and for whose relief the ex parte seizure remedy was created. The plaintiff's lawyer can-

not be injured by the defendant's violation of the Lanham Act. The requirement of immediate and irreparable injury suggests that Congress did not have lawyers in mind when it authorized applications for *ex parte* seizures.

Finally, under section 1116(d)(4)(B)(vi), it must clearly appear that "the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered." *Id.* § 1116(d)(4)(B)(vi). This subsection would simply make no sense if the term "applicant" were read to include attorneys. An attorney cannot suffer harm as a result of the defendant's counterfeiting of a mark, nor can she suffer greater harm than the defendant whose goods are being seized. Only the plaintiff can be harmed by the court's failure to grant an application for an *ex parte* seizure order. The term "applicant" in section 1116(d)(4)(B)(vi) clearly refers only to a party, and not to an attorney. If a lawyer were an "applicant," a district court could never grant an *ex parte* seizure order "unless it clearly appeared from specific facts" that the lawyer would suffer greater injury than the defendant. *Id.* § 1116(d)(4)(B), (d)(4)(B)(vi). Congress could not have intended to require district courts to make such an illogical finding.

We also note that elsewhere in section 1116(d), Congress distinguishes between applicants and those who act on their behalf:

> The court shall issue orders, when appropriate, to protect the defendant from undue damage from the disclosure of trade secrets or other confidential information during the course of the seizure, including, where appropriate, orders restricting the access of the *applicant (or any agent or employee of the applicant)* to such secrets or information.

*Id.* § 1116(d)(9) (emphasis added). This subsection was apparently included to pre-vent the "applicant" from causing undue damage to the trade secrets of the defendant. We agree with the district court that a common sense interpretation of this subsection indicates that the term "applicant" refers to the plaintiff, who is the person most likely to benefit from reviewing a competitor's trade secrets or confidential information. Such usage of the term "applicant" is consistent with sections 1116(d)(4)(B)(iii) and (vi), which we conclude also uses the term "applicant" to refer to a plaintiff or party. *See supra.* Furthermore, section 1116(d)(9) clearly distinguishes between the applicant and his agent, and lawyers are agents of their clients. If Congress intended for the other provisions of § 1116(d) to apply to both the applicant and his legal representative, it would probably have done so expressly, as it did in section 1116(d)(9).

After carefully examining the text of section 1116(d), with special attention to the uses of the word "applicant," we hold that it is plainly apparent from the context that Congress did not intend for the statutory definition of "applicant" as legal representative to apply to 15 U.S.C. § 1116(d)(11).[1] We have not examined the legislative history to resolve this issue because we conclude that it is clear from the text of the Lanham Act that section 1116(d)(11) does not provide a cause of action against a party's attorneys. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 900 (1984) (where resolution of a question of federal law turns upon a statute and the intention of Congress, the court looks first to the statutory language and then to the legislative history if the statutory language is unclear). An attorney could only be an "applicant" under section 1116(d)(11) if that term had a different meaning in section 1116(d)(11) than it does in the other portions of section 1116(d). Such a conclusion is unwarranted in light of the obvious interconnection be-

---

1. The district court did not mention the statutory definition of "applicant" in 15 U.S.C. § 1127, which encompasses legal representatives. In holding that lawyers are not applicants under section 1116(d)(11), the court partially relied on the legislative history of section 1116(d) indicat-ing that Congress considered the "applicant" to be a party. *Electronic Lab. Supply Co.,* 782 F.Supp. at 1018–19 (citing S.Rep. No. 98–526, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3629).

tween section 1116(d)(1)–(10), which creates a procedure for obtaining an *ex parte* seizure, and section 1116(d)(11), which provides the remedy for abuse of that procedure.

We realize that attorneys are the ones who actually prepare an application for an *ex parte* seizure order or a temporary restraining order, and the client may be unaware of wrongdoing committed by the attorney. Nonetheless, we cannot expand the language of section 1116(d) to encompass causes of action not intended by Congress, nor is it necessary to do so to provide relief from damages caused by attorney misconduct. In the usual case of wrongful seizure, the party whose goods were seized (the defendant) will sue the applicant (the plaintiff) under section 1116(d)(11), and then the applicant may implead his attorney for legal malpractice.[2] The attorneys can also be sued directly by the party whose goods were seized, or impleaded by the applicant, under other theories such as wrongful use of civil proceedings, trespass, and conversion. We hold only that attorneys cannot be defendants under section 1116(d)(11).

### III.

Appellants argue that even if an attorney is not an "applicant" and therefore not a proper defendant under section 1116(d)(11), the appellees should still be subject to common law aiding and abetting liability. Whether there is aiding and abetting liability under section 1116(d)(11) is a question of first impression.

Aiding and abetting liability traditionally applies to criminal offenses, and it is a basis of federal criminal liability under 18 U.S.C. § 2 (1988). In *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356 (3d Cir.1987), this court developed a general framework for determining when aiding and abetting liability can be a theory of civil recovery under a federal statute. The application of common law aiding and abetting liability to litigation under a federal statute is appropriate when it advances the goals of the particular statute, *id.* at 1356, and when the structure and text of the statute indicate a congressional intent to incorporate such liability, *see id.* at 1358, 1359–61. After analyzing the RICO statute, the *Petro–Tech* court concluded that Congress intended to permit aiding and abetting liability in civil actions under 18 U.S.C. § 1962(a), but not in civil actions under 18 U.S.C. § 1962(c). *Id.* at 1359–61. In addition to civil RICO, this court has applied common law aiding and abetting liability to civil actions under section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 (" '34 Act"), *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 161–64 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), and to civil actions under section 14(a) and Rule 14a–9 of the '34 Act, *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir.1976).

It is significant that all of the above federal statutes under which civil aiding and abetting liability has been found are criminal statutes. In 18 U.S.C. § 2, Congress clearly expresses its intent that aiding and abetting liability applies to all federal criminal offenses, and it logically follows that such liability should attach to civil actions under the same statutes for essentially the same misconduct. In *Petro–Tech*, this court applied aiding and abetting liability to civil RICO only after observing that Congress imposed statutory aiding and abetting liability on criminal RICO and the predicate offenses which are elements of RICO. *See* 824 F.2d at 1357–58. In contrast, 15 U.S.C. § 1116(d)(11) is a purely civil statute. It is also a component of a larger statute, the Lanham Trademark Act, which also is purely civil. Unlike federal criminal law, federal civil law and especially federal civil statutes do not give rise to an automatic presumption of aiding and abetting liability.

---

**2.** This approach was impossible in this case because ELSCO settled with the client, Motorola, and only preserved its claims against the attorneys, Cullen, Hauben, and Wolfson.

Recent cases suggest that a court should be more cautious in determining the scope of liability under federal civil statutes. In *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court addressed the question of who is a "seller" of securities under section 12(1) of the Securities Act of 1933 ("'33 Act"), which provides that "[a]ny person who ... offers or sells a security" in violation of the registration requirements of section 5 "shall be liable to the person purchasing such security from him." 15 U.S.C. § 77*l* (1988). The Court read section 12(1) narrowly and concluded that its language and purpose indicate that liability extends only to the person who successfully solicits a purchase to serve his own or the securities owner's financial interest. *Id.* at 647, 108 S.Ct. at 2078, 100 L.Ed.2d at 682. Thus, a person is not a statutory seller if he was merely a "substantial factor" in the sale, *id.* at 653–54, 108 S.Ct. at 2082, 100 L.Ed.2d at 686, and the Court stated in dictum that lawyers and accountants, who only perform professional services, would normally not be liable under section 12(1), *id.* at 651, 108 S.Ct. at 2081, 100 L.Ed.2d at 684–85. The issue of whether there is aiding and abetting liability under section 12(1) was reserved. *Id.* at 648–49 n. 24, 108 S.Ct. at 2079 n. 24, 100 L.Ed.2d at 684 n. 24.

Relying in part on *Pinter*, we held in *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 636–37 (3d Cir.1989), that there is no aiding and abetting liability under section 12(2) of the '33 Act. We had three reasons for our decision: (1) the language of section 12 expressly limits liability to those who offer or sell securities, (2) *Pinter* clearly directs that liability does not extend to collateral participants, and (3) the rescission remedy of section 12 is not analogous to criminal or tort law, where aiding and abetting liability has been found. *Id.;* see also *Ackerman v. Schwartz*, 947 F.2d 841, 845 (7th Cir.1991) (imposition of aiding and abetting liability under section 12(2) would frustrate express intent of Congress).

Though section 34(d)(11) of the Lanham Act is more like a "tort" statute than section 12 of the '33 Act, we conclude that the principles stated in *Craftmatic* apply to this case. The Lanham Act contains a very thorough and detailed set of rules and procedures governing the granting of *ex parte* seizure orders. See 15 U.S.C. § 1116(d) (1988). Section 1116(d)(11) creates a very specific cause of action: a civil action for damages caused by wrongful use of the *ex parte* seizure provisions of the Lanham Act. Section 1116(d)(11) expressly limits liability to the "applicant for the order" for *ex parte* seizure, and the statute is silent regarding any form of participant liability, including aiding and abetting liability. The specific and detailed language of section 1116(d) sharply contrasts the broad provisions of sections 10(b) and 14(a) of the '34 Act, which impose liability on any person who offers or sells securities or solicits proxies through fraudulent means. See 15 U.S.C. §§ 78j, 78n (1988); 17 C.F.R. §§ 240.10b–5, 240.14a–9 (1992). Where a federal, civil statute like section 1116(d)(11) expressly imposes liability on only a small class of defendants for specific misconduct, it is inappropriate for a court to apply common law doctrines to write new causes of action into that statute. This principle was well-stated by one district court:

> [W]here a statute specifically limits those who may be held liable for the conduct described by the statute, the courts cannot extend liability, under a theory of aiding and abetting, to those who do not fall within the categories of potential defendants described by the statute. To impose such liability would circumvent the express intent of Congress in enacting these statutes that proscribe narrowly defined conduct and allow relief from precisely defined parties.

*In re Equity Corp. of America Sec. Litig.*, 416 F.Supp. 161, 181 (C.D.Cal.1976) (there is no aiding and abetting liability under section 11 of the '33 Act, which authorizes civil actions by purchasers of securities registered under false registration statements). We agree with this reasoning and now apply it to 15 U.S.C. § 1116(d)(11). Having examined both the text and legislative history of the statute, we can find no

evidence of a congressional intent to impose aiding and abetting liability.

Plaintiffs contend that aiding and abetting liability would further the purpose of section 1116(d)(11), but we are not so sure. Imposing such liability would probably deter some wrongful seizures and help to compensate some victims, but Congress could have easily provided for such liability in the statute if it so intended. When it enacted section 1116(d)(11), Congress must have been aware of existing causes of action, applicable against attorneys and parties, under various common law intentional tort theories, as well as under state statutes which create a damages cause of action for wrongful use of civil proceedings. *See, e.g.,* 42 Pa.Cons.Stat.Ann. §§ 8351–8355 (1982 & Supp.1992). In providing a claim only against the "applicant," Congress' purpose may have been to provide a limited supplement to available common law and statutory remedies, without authorizing suits against many different persons on an issue normally collateral to the subject matter of a trademark infringement action. Even if we thought that aiding and abetting liability would further the statute's purpose, we could not expand the scope of liability significantly beyond the statute's express limits, absent some evidence in the text or structure of section 1116(d) indicating that Congress intended for us to do so. We have found no such evidence.

The parties have not cited, nor has our research disclosed, any case imposing aiding and abetting liability under the Lanham Act. Plaintiffs cite several cases holding corporate officers jointly liable with their corporations for trademark and copyright infringement. *See, e.g., Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir.1978); *Columbia Pictures Indus. v. Redd Horne,* 749 F.2d 154 (3d Cir.1984); *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145 (4th Cir.1987). Their reliance on these cases is misplaced.

In *Polo Fashions,* 816 F.2d at 149, a corporate president and a manager who sold shirts bearing an imitation of the Ralph Lauren polo emblem were held liable under sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125. They were subjected to principal liability and the case therefore is inapposite. *See id.*

In *Donsco,* 587 F.2d at 606, a penny-bank manufacturer was liable under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for copying its sole competitor's certificate of authenticity. The corporate president who authorized and approved the act of unfair competition was also held liable under section 43(a). *Id.* This court concluded that a corporate officer who actually and substantially participates in the corporation's act of trademark infringement is personally liable under section 43(a), even though he acted as an agent of the corporation rather than on his own behalf. *Id.*

*Donsco* indicates that a person who knowingly and significantly participates in another's act of trademark infringement is himself guilty of infringement. *Cf. Redd Horne,* 749 F.2d at 160–61 (persons who knowingly and substantially participate in copyright infringement are liable as co-infringers under the Copyright Act). However, we do not think that the scope of liability under section 1116(d)(11) should necessarily be the same as under statutes prohibiting trademark and copyright infringement. Section 43(a) of the Lanham Act, the statute at issue in *Donsco,* is very broadly worded and applies to "any person" who uses virtually any means to deceive the public regarding the origin or nature of goods, services, or commercial activities. *See* 15 U.S.C. § 1125(a) (1988); *see also* Lanham Act § 32(1), 15 U.S.C. § 1114(1) (1988) (imposing liability on "[a]ny person" who sells, distributes, or advertises goods or services through use of any kind of an imitation of a registered mark likely to deceive the public). Although section 1116(d)(11) is also a part of the Lanham Act, it does not prohibit trademark infringement at all, but instead prohibits very different and more narrowly defined misconduct: wrongful *ex parte* seizure of goods. On its face, section 1116(d)(11) only applies against the "applicant" for the *ex parte* seizure order who wrongfully caused damage. Applying any

theory of participant liability could authorize suits against a much wider class of persons than intended by Congress, so far as we can determine that intent from the specific and limiting language of the statute.[3]

Plaintiffs also argue that we can apply common law aiding and abetting liability to section 1116(d)(11) under the Restatement (Second) of Torts § 876 (1979), which subjects a person to liability if he (a) commits a tort in concert with another, (b) knows that another's conduct is a tort and gives substantial assistance or encouragement, or (c) gives substantial assistance through conduct which, separately considered, is a tort. *Id.* The Restatement has guided this court in applying aiding and abetting liability under federal statutes which create both criminal and civil causes of action, *see Petro–Tech,* 824 F.2d at 1357 (RICO, 18 U.S.C. § 1962(a)); *Gould,* 535 F.2d at 779 (section 14(a) and Rule 14a–9 of the '34 Act); *Landy,* 486 F.2d at 162–63 (section 10(b) and Rule 10b–5 of the '34 Act), and to criminal acts resulting in subsequent civil tort liability, *see Fassett v. Delta Kappa Epsilon (New York),* 807 F.2d 1150, 1162–63 (3d Cir.1986) (social host liable for serving alcohol to minor who drove while intoxicated), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987); *see also Halberstam v. Welch,* 705 F.2d 472, 481–82 (D.C.Cir.1983) (defendant who laundered money in furtherance of burglary conspiracy was civilly liable for burglaries and murder).

We agree with the district court that the cause of action created under section 1116(d)(11) is not analogous to the federal statutory causes of action for which common law aiding and abetting liability is available. Such liability has only been applied to civil actions under federal criminal statutes, which already were subject to criminal aiding and abetting liability under 18 U.S.C. § 2. The cause of action in section 1116(d)(11) is not sufficiently analogous to any common law tort to justify imposing common law aiding and abetting

liability absent any statutory basis for doing so. As the district court observed, the Lanham Act's authorization of *ex parte* seizures of counterfeit goods was not available at common law. In the Act, Congress created the federal statutory cause of action for the counterfeiting of marks, authorized *ex parte* seizures to help remedy such counterfeiting, and provided a cause of action against the Lanham Act plaintiff who wrongfully uses that remedy. *See* 15 U.S.C. §§ 1114(1), 1116(d)(1)(A), 1116(d)(11) (1988). Congress did not enact section 1116(d)(11) to codify any portion of the common law of torts, but rather to regulate a specific type of injunctive relief provided in the Lanham Act. The cause of action in section 1116(d)(11) was created by statute and applies only to the abuse of a remedy, *ex parte* seizures of counterfeit goods, created by the same statute. The relationship between section 1116(d)(11) and the common law of torts is therefore tenuous at best.

In conclusion, section 1116(d)(11) is a purely civil statute, imposes liability for specific misconduct, expressly limits liability to a particular class of defendants (the "applicant"), and is not clearly analogous to any common law tort. Under these circumstances, we conclude that Congress did not intend to impose common law aiding and abetting liability under section 1116(d)(11).

## IV.

For all of the foregoing reasons, we hold that an attorney is not an "applicant" under 15 U.S.C. § 1116(d)(11) and that there is no aiding and abetting liability under that statute. We will therefore affirm the order of the district court which granted summary judgment.

---

**3.** We are not implying that there is aiding and abetting liability under section 1125. That question is not presented. We are only saying that

the language of sections 1125 and 1116(d)(11) suggests that the scope of liability under the latter statute is narrower.