

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-9-1994

# AT&T, Co. v. Winback and Conserve Program, Inc.

Precedential or Non-Precedential:

Docket 94-5305

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"AT&T, Co. v. Winback and Conserve Program, Inc." (1994). *1994 Decisions*. Paper 213.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/213

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 94-5305
_____

AMERICAN TELEPHONE AND TELEGRAPH COMPANY

v.

WINBACK AND CONSERVE PROGRAM, INC.,
a New Jersey corporation;
ALFONSE G. INGA, an individual

American Telephone and
Telegraph Company ("AT&T"),

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 93-5456)
_____

Argued November 1, 1994

BEFORE:  GREENBERG and McKEE, Circuit Judges,
and POLLAK, District Judge*

(Filed:  December 9, 1994)
_____

FREDERICK L. WHITMER (argued)
FRANCINE A. FRANKLIN
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, NJ  07962-1945

EDWARD R. BARILLARI
AT&T Corp.
295 N. Maple Ave.
Basking Ridge, NJ

Attorneys for Appellant

*The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

                          H. CURTIS MEANOR (argued)
                          LAWRENCE S. COVEN
                          MARTHA LEWIS MARCUS
                          Podvey, Sachs, Meanor, Catenacci,
                                  Hildner & Cocoziello, P.C.
                          The Legal Center
                          One Riverfront Plaza
                          Newark, NJ  07102

                          CHARLES H. HELEIN
                          Helein & Waysdorf, P.C.
                          1850 M. Street, N.W.
                          Suite 550
                          Washington, DC  20036

                                     Attorneys for Appellees

_____

OPINION OF THE COURT
_____


GREENBERG, Circuit Judge.

          In this case, the American Telephone and Telegraph Company ("AT&T") seeks to hold the defendants-appellees -- Winback and Conserve Program, Inc. ("Winback") and Alphonse G. Inga -- liable for acts of unfair competition by the defendants' sales representatives.  The district court, in an Opinion and Order dated May 12, 1994, denied AT&T's application for a preliminary injunction, finding that Winback and Inga exerted insufficient control over the sales representatives to justify the imposition of liability upon Winback and Inga.  AT&T v. Winback & Conserve Program, 851 F. Supp. 617 (D.N.J. 1994) ("Winback").  Because we find that the district court committed errors of law in denying AT&T's motion for a preliminary

injunction against Winback and Inga, we will vacate the Order of the district court and we will remand the matter for further proceedings.

## I.  Introduction and Factual Background[1]

AT&T is a long-distance telecommunications carrier that, as part of its marketing strategy, uses a variety of service marks and trademarks, including the initials "AT&T" and the AT&T "globe" symbol.  AT&T markets and sells telecommunications services to customers, and its rates and practices are governed by tariffs it files with the Federal Communications Commission.  Not only does AT&T provide services to "end-users" -- customers who purchase service for themselves -- but, pursuant to a 1976 FCC ruling, AT&T offers long distance telecommunications services it provides under a tariff for resale.  See In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities, 60 F.C.C.2d 261 (1976); In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services, 83 F.C.C.2d 167 (1980); Winback, 851 F. Supp. at 618.  The resale market works as follows:  Resellers, or aggregators, subscribe to AT&T programs which provide large discounts for high volume purchases of AT&T

---

[1].  Unless otherwise noted, the facts set forth in the text are taken from the district court's Opinion in this case, reported at 851 F. Supp. 617 (D.N.J. 1994).

telecommunications services. The resellers then sell the services to individual businesses that do not generate sufficient volume to qualify individually for the high-volume discounts. Thus, by providing the services to these end-users, resellers make a profit while end-users receive access to the AT&T network at a significantly lower cost than if they purchased services from AT&T directly. Under some programs -- including the one at issue on this appeal -- AT&T bills the end-users directly and they make payments directly to AT&T. Also, pursuant to some resale agreements, the end-users receive the services associated with access to the AT&T network directly from AT&T.[2] Nonetheless, in the resale business, only the reseller is a customer of AT&T; the end-users are customers of the reseller and not of AT&T.

Appellee Winback is a reseller of 800 inbound telecommunications services and appellee Inga is its president. As a matter of convenience, hereafter we usually will refer to both simply as Winback. Winback offers end-users access to the AT&T 800 inbound network at a discount price. As are other resellers, Winback is both a customer and a competitor of AT&T.

This case really began in April 1992, when AT&T filed a complaint and application for a temporary restraining order alleging that one of Inga's other companies, One Stop Financial, Inc., was infringing on AT&T's trademarks and service marks,

_____

[2]. This is accomplished by the reseller's issuance of a letter of agency. Winback, 851 F. Supp. at 619.

falsely representing that it was affiliated with AT&T and passing itself off as AT&T.[3]  The parties resolved the case by entering into a Consent Final Order and Injunction, filed on May 7, 1992, which enjoined One Stop and its officers, directors, employees and agents from engaging in such practices.[4]  In September 1993, AT&T filed a motion to hold One Stop in civil contempt of the Consent Order.  One Stop and Inga defended by arguing that their sales and marketing representatives, over whom One Stop had no control, were responsible for any infringing acts.[5]  Consequently, as a result of AT&T's application, on September 27, 1993, the Final Order and Injunction was amended to obligate One Stop to serve each of its sales agents with a copy of the Order, and, in turn, to obligate each of the primary agents to serve the Order upon all subagents they had authorized to market under the name One Stop Financial, Inc.

Soon after the amended Final Order was filed, AT&T filed a second application to hold One Stop and Inga in contempt, this time basing its claim for relief on allegedly infringing activity on the part of Winback, Inga's other company (and the corporate defendant in the instant action).  Winback, 851 F. Supp. at 620.  The district court informed the parties that the motion for contempt would not be heard until discovery was

[3].  AT&T v. One Stop Fin., Inc., No. 92-1489 (D.N.J.) (NHP).  See AT&T Brief at 3.

[4].  See AT&T Complaint ¶48 at app. at 20; Winback Answer ¶48 at app. 379.

[5].  See AT&T Brief at 4.

completed. AT&T responded by filing this action, on December 13, 1993, against Winback and Inga, alleging false designation of origin, passing off, and unprivileged imitation in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125, as well as various state common law claims. AT&T sought, among other relief, temporary restraints, and preliminary and permanent injunctions. The district court held a hearing on AT&T's application for a temporary restraining order on December 15, 1993. See Order To Show Cause With Temporary Restraints, app. at 366. On December 17, 1993, the district court issued a temporary restraining order enjoining and restraining "Defendants, together with their officers, agents, servants, employees, attorneys and all persons in active concert or participation with them" from:

>        (a) employing any oral communication,
>        advertisement, label, sign, flyer, envelope
>        or correspondence or any other written
>        documentation that falsely designates the
>        origin of Defendants' goods or services as
>        being those of the American Telephone and
>        Telegraph Company or of AT&T, or that is
>        likely to cause confusion as to whether
>        Defendants' goods or services are sponsored
>        by, or affiliated with the American Telephone
>        and Telegraph Company;
>
>        (b) engaging, producing, creating,
>        encouraging, aiding or abetting any oral
>        communication, advertisement, label, sign,
>        flyer, envelope, correspondence or any other
>        oral or written communication which enables
>        Defendants to pass off their goods or
>        services as being those of the American
>        Telephone and Telegraph Company.

Order to Show Cause at 3-4, app. at 367-68. The Order prevented the defendants and their agents from "introducing into . . .

commerce . . . any document promoting or identifying Winback and Conserve Program, Inc., which does not conspicuously identify Winback and Conserve Program, Inc. as a corporation through the use of the abbreviation, 'Inc.' and which does not identify a business mailing address." Id. Finally, Winback was ordered to serve a copy of the Order upon its primary agents (identified in an Appendix to the Order) who in turn were obligated to serve the Order on any sub-agents they had employed to do Winback's marketing. The court in that Order set a return date for a hearing on AT&T's application for a preliminary injunction. Winback answered AT&T's complaint on January 18, 1994. After expedited discovery, full briefing, and the submission of detailed affidavits, the district court held a hearing on AT&T's application, between March 1 and March 11, 1994.

At the hearing, much of the testimony described Winback's method of attracting customers. The evidence demonstrated that Winback employs no marketing or sales people on its staff. Rather, it attracts business solely through the use of sales networks and/or marketing representatives. Specifically, it uses about 50 different marketing agencies, which in turn employ or contract with scores more individual sales representatives. The representatives work out of their own offices, and receive no supplies, equipment or space from Winback. Winback compensates these representatives purely on a commission basis, and the representatives are under no minimum obligation to Winback. Indeed, many representatives market for various resellers. This does not mean, however, that there is

little connection between the agents and Winback.  The agents are supplied with forms which AT&T requires to be completed to transfer customers to Winback's services (the transfer forms).  Until October 13, 1993, these forms contained the initials "AT&T" and the AT&T globe symbol.  On that date, AT&T ordered the resellers to delete those references.  These forms also make reference to Winback.  Moreover, at least one of the representatives contacts Inga on a regular basis, and Inga attempts to "polic[e]" the agents to avoid misrepresentations. Winback, 851 F. Supp. at 619.

Generally, as the evidence before the district court demonstrated, sales representatives contact end-users and present them with the Winback plan.  The representatives then send prospective customers various forms, including a facsimile cover sheet, informational documents, the transfer form, and a Main Billed Telephone Numbers Location List ("main billed form").  Interested end-users complete the transfer form and the main billed form and send them back to the representative, who then forwards them to the primary marketing or sales agency.  The agency, in turn, sends the forms to Winback, which returns them to AT&T.  Each month, AT&T sends Winback a check for the difference between the discount given Winback by AT&T and the average discount Winback passes on to the end-user.  Winback then sends commission checks to the various marketing representatives.

At the hearing, AT&T presented evidence that end-user customers were deceived into believing they were dealing with AT&T.  First, many witnesses testified that they received

telephone solicitations by Winback representatives informing them that they were affiliated with AT&T. See, e.g., Winback, 851 F. Supp. at 621 (citing testimony of Arthur Sanchez and Daniel Flood); certification of Daniel A. Flood at 2, app. 72. Several witnesses also testified that information contained in various written materials misled them into believing that Winback was a division of AT&T.

As an example, one employee of an end-user, Debra Vogel, a telecommunications employee of The Toro Company, testified that she was confused by a facsimile transmission entitled "Winback & Conserve Program for AT&T 800 Customers" that she received from a Winback representative. Because "Winback & Conserve Program" was not stated as a separate entity (such as by including the letters "Inc." after "Program"), Vogel believed that Winback & Conserve Program was a marketing arm of AT&T and that the documents she received were official AT&T documents. Winback, 851 F. Supp. at 620-21; certification, app. at 36-40. More generally, several other end-user customers testified to being confused by the following materials they received from Winback's sales representatives: (1) a facsimile cover sheet not mentioning Winback but stating that "[w]e are bringing you together for less with AT&T network services", see Winback, 851 F. Supp. at 621; certification of Arthur W. Sanchez at 4 & Exhibit A, app. at 58, 61; (2) a facsimile cover sheet entitled "The New AT&T 800 Winback & Conserve Program" and stating "Please authorize discount acceptance immediately and fax back to 1-800-251-5491 for forwarding to the AT&T Input Department", see

Winback, 851 F. Supp. at 621-22 (citing testimony of Ekaterina Hall, Karen Kelly, Daniel Flood, and Phillip Kenney)[6]; (3) the transfer form displaying the AT&T initials and globe symbol in the corner, id. (citing testimony of Ekaterina Hall, Karen Kelly, Arthur Sanchez, Daniel Flood, Thomas Malanga, and Phillip Kenney); (4) a main billed form stating "Winback & Conserve Program" at the top, id. at 621-23 (citing testimony of Debra Dahl Vogel, Ekaterina Hall, Karen Kelly, Phillip Kenney, James Angelici and Kay Mills); (5) an information form detailing the Winback program and instructing the customer to complete the accompanying main billed form "provided to us by AT&T", id. at 621 (citing testimony of Arthur Sanchez); (6) a form entitled "AT&T 800 Readyline Summary of Charges", displaying the AT&T initials and globe, id. at 621 (citing testimony of Daniel Flood); and (7) several other documents referencing the "Winback and Conserve Program". Id. at 621-23. Based on the oral representations and the written documents, the witnesses testified that they believed they were dealing with AT&T's Winback and Conserve Program, rather than with a reseller that was a separate corporation. Id.[7] However, the evidence indicated that all the allegedly infringing actions were performed by the sales agencies or the sales representatives,

_____

[6]. Apparently, AT&T does not have an input department.

[7]. As noted above, AT&T originated the transfer form and the main billed form, which contain the initials AT&T and the AT&T globe symbol. On October 13, 1993, AT&T ordered all resellers to eliminate the AT&T initials and the globe logo from those forms.

without the knowledge, consent, assistance or encouragement of Winback or Inga.  Id. at 623.

Based on this evidence, the district court found that "[t]here is no question that [AT&T] submitted sufficient proofs to the Court to establish that consumers have been confused by certain oral misrepresentations made by and written documents provided by the Winback sales representatives."  Id. at 630.  The court then addressed whether Winback and Inga could be held responsible for the acts of their sales representatives.  The court looked to the common law of torts "to determine the boundaries of liability."  Id. at 624.  It then asked whether, pursuant to New Jersey law of agency, Winback and/or Inga could be held vicariously liable for the torts of their sales agents. Relying primarily on a recent New Jersey Supreme Court case distinguishing between agents (for whose torts the principal may be liable) and independent contractors (for whose torts the principal generally may not be held liable), the court found that AT&T only had established that the sales representatives were independent contractors.  AT&T, in the court's view, had not met its burden of proving that Winback and/or Inga exercised sufficient control over their sales representatives to constitute an agency relationship.  The court primarily relied on the facts that the representatives are commissioned rather than salaried, that they work on behalf of a number of companies, and that their operating expenses and business are purely their own responsibilities.  Thus, the court concluded, "the level of joint activity between [Winback] and Inga and the sales representatives

is . . . minimal and peripheral to the nuts and bolts of the business of marketing and promoting." Id. at 626. Furthermore, the court found that AT&T contributed to the customers' confusion, that the resale business was inherently confusing as to the point of origin of the service, and that the public interest did not weigh in favor of granting an injunction. Thus, the district court denied AT&T's application for a preliminary injunction, and vacated the temporary restraints.

AT&T timely filed a notice of appeal from the district court's order. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). The district court properly exercised jurisdiction over AT&T's Lanham Act claims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

## II. Discussion

### A. Standard of Review

"[T]he grant of injunctive relief is an extraordinary remedy . . . which should be granted only in limited circumstances." Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (citing United States v. City of Philadelphia, 644 F.2d 187, 191 n. 1 (3d Cir. 1980)). This proposition is particularly apt in motions for preliminary injunctions, when the motion comes before the facts are developed to a full extent through the normal course of discovery. In ruling on a motion for a preliminary injunction, the court must consider:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. Opticians Ass'n v. Independent Opticians, 920 F.2d 187, 191–92 (3d Cir. 1990). The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief. Id. at 192.

Merchant & Evans, Inc. v. Roosevelt Bldg. Prods., 963 F.2d 628, 632–33 (3d Cir. 1992).[8]

Our review of the district court's decision is limited. We must affirm unless, in denying the motion, "'there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof.'" Frank's GMC Truck Center, 847 F.2d at 101 (quoting Moteles v. University of Pennsylvania, 730 F.2d 913, 918 (3d Cir.), cert. denied, 469 U.S. 855, 105 S.Ct. 179 (1984)). The scope of our review is narrow because "'the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing

---

[8]. In earlier cases, we have held that these latter two factors should be taken into account only when they are relevant. Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197–98 (3d Cir. 1990); Morton v. Beyer, 822 F.2d 364, 367 & n.3 (3d Cir. 1987); Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir. 1975). As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff. Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors. See Duraco Prods., Inc. v. Joy Plastic Enter., Ltd., No. 93–3323, slip op. at 11 (3d Cir. Nov. 15, 1994).

[that] is the responsibility of the district judge.'"  Frank's GMC Truck Center, 847 F.2d at 101-02 (alteration in original) (quoting United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970)).

Despite the narrow scope of review, "any determination that is a prerequisite to the issuance of an injunction . . . is reviewed according to the standard applicable to that particular determination."  Merchant & Evans, 963 F.2d at 633 (alteration in original) (quoting John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 658 (3d Cir. 1986), cert. denied, 479 U.S. 1059, 107 S.Ct. 939 (1987)).  Therefore, "'[d]espite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge whose decisions will be reversed only for "abuse", a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law.'"  Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1242 (3d Cir. 1983) (quoting Donovan v. Bierwirth, 680 F.2d 263, 269 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488 (1982)), cert. dismissed, 464 U.S. 1033, 104 S.Ct. 690 (1984).  In the final analysis, "[w]e review the district court's conclusions of law in a plenary fashion, its findings of fact under a clearly erroneous standard, and its decision to grant or deny an injunction for abuse of discretion." Johnson & Johnson-Merck Consumer Pharmaceuticals, Inc. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 127 (3d Cir. 1994) (citations omitted); see also Duraco Prods., slip op. at 12.

## B.  AT&T's section 43(a) claim

### 1.  Generally

The district court focused primarily on whether AT&T had demonstrated a "likelihood of success on the merits" and held that AT&T had not met its burden by a preponderance of the evidence.  We, likewise, will focus on the district court's conclusion that AT&T failed to demonstrate a likelihood of success on the merits.  As a threshold matter, this appeal requires us to decide a question of statutory construction, namely, the extent to which federal courts interpreting federal statutes may import into such statutes common law doctrines of secondary liability.

Section 43(a) of the Lanham Act, originally enacted in 1946 and amended substantially in 1988, provides in relevant part that:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . is likely to deceive as to the affiliation, connection or association of such person with another person, or as to origin, sponsorship or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  By containing such broad language, the Act

"proscribes not only trademark infringement in its narrow sense, but more generally creates a federal cause of action for unfair competition."  Duraco Prods., Inc., slip op. at 12; American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986) (citing Williams v. Curtiss-Wright Corp., 691 F.2d 168, 172 (3d Cir. 1982)); see also 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §27.02[1] at 27-13 (hereinafter "McCarthy on Trademarks").  In order to succeed on its claim, AT&T must prove by a preponderance of the evidence that:

(1) Winback uses a false designation of origin, as defined in the Act;

(2) That such use of a false designation occurs in interstate commerce in connection with goods and services;

(3) That such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of Winback's goods or services by another person; and

(4) That AT&T has been or is likely to be damaged.

See 3 McCarthy on Trademarks, § 27.03[1][a] at 27-21.[9]

---

[9]. AT&T's allegations are an amalgam of a classic section 43(a) claim alleging misuse of a mark, a claim of false advertising pursuant to 15 U.S.C. § 1125(a)(2), and a claim of passing off. In the false advertising area, we have held that a plaintiff must prove by a preponderance of the evidence:

'(1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions;

This appeal focuses on a subset of the first prong of the test: whether Winback falsely designated the origin of its services. AT&T does not argue that Winback directly infringed on its rights. Rather, AT&T bases its claim for relief upon the actions of Winback's sales representatives. It contends that under common law theories of agency including the doctrine of apparent authority, Winback is liable for the infringing actions of its sales representatives. Winback disclaims any responsibility for its sales representatives, over whom they claim to have little control.

(..continued)
        (4) that the advertised goods travelled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.'

Johnson & Johnson-Merck, 19 F.3d at 129 (quoting U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922-23 (3d Cir. 1990), cert. denied, 498 U.S. 816, 111 S.Ct. 58 (1990) (quoting Max Daetwyler Corp. v. Input Graphics, Inc., 545 F. Supp. 165, 171 (E.D. Pa. 1982)). In cases alleging unprivileged imitation of the plaintiff's marks, a plaintiff must prove "(1) that the imitated feature is non-functional, (2) that the imitated feature has acquired a 'secondary meaning,' and (3) that consumers are likely to confuse the source of plaintiff's product with that of defendant's product." American Home Prods. Corp. v. Barr Lab., Inc., 834 F.2d 368, 370 (3d Cir. 1988) (citation omitted). A claim of passing off generally focuses solely on the likelihood of the customers' confusion, and involves a comparison between the two products. The essence of AT&T's claims is not that the defendants misled customers purely by misuse of the AT&T initials and the AT&T globe, but that by a series of misrepresentations -- including oral representations, misleading use of AT&T's marks, and misleading description of Winback's name -- the defendants confused end-user customers into believing Winback was affiliated with AT&T. Thus, none of the tests outlined in this footnote adequately captures the essence of AT&T's claims. The test we employ is geared to the factual situation of this case.

The statute, by referring to "any person" who infringes on a plaintiff's rights, is silent as to the existence, or the scope, of vicarious liability; the statutory language is directed solely at the infringers themselves.  Thus, we are called upon to examine whether the statute permits us to look beyond its contours at all.  See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., ____ U.S. ____, ____, 114 S.Ct. 1439, 1446 (1994) ("With respect [to] the scope of conduct prohibited by [a statute], the text of the statute controls our decision."); Electronic Lab. Supply Co. v. Cullen, 977 F.2d 798, 806 (3d Cir. 1992) ("'Where a statute specifically limits those who may be held liable for the conduct described by the statute, the courts cannot extend liability . . . to those who do not fall within the categories of potential defendants described by the statute.'") (quoting In re Equity Corp. of America Sec. Litig., 416 F. Supp. 161, 181 (C.D. Cal. 1976)).  The questions to be addressed are (1) whether the district court was correct in importing common law doctrines into section 43(a) of the Lanham Act and (2) if so, whether the district court properly applied those doctrines.

### 2.  The effect of Central Bank

Generally, "the applicability of common law doctrines in litigation under federal statutes depends on whether those principles advance the goals of the particular federal statute which plaintiffs allege has been violated." Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1356 (3d Cir. 1987)

(citing American Soc'y of Mechanical Eng'rs v. Hydrolevel Corp., 456 U.S. 556, 570, 102 S.Ct. 1935, 1944-45 (1982)); O'Neil v. Q.L.C.R.I., Inc., 750 F. Supp. 551, 555 (D.R.I. 1990). Of course, the days of a general federal common law have long since passed, see Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822 (1938), and courts should be wary about looking outside of the statute itself to expand the scope of liability, lest they accurately be accused of legislating from the bench. Cf. Stomper v. Amalgamated Transit Union, Local 241, 27 F.3d 316, 319 (7th Cir. 1994) ("Once Congress has legislated, the common-law rules courts apply to fill interstices fall away."). Thus, when a statute is self-contained, the scope of our interpretation is constrained by the statutory language itself. See, e.g., Central Bank, ____ U.S. at ____, 114 S.Ct. at 1447. Nonetheless, when the importation of common law doctrines will advance the goals of the statute, courts may utilize the doctrines, provided the courts "conform [the] implied remedies to the rules Congress devised for the remedies it authorized expressly." Stomper, 27 F.3d at 319.

Winback implicitly argues that if we import the doctrines of agency and apparent authority into the statute, we would be violating this settled rule of construction and that we would be legislating in areas where Congress has failed to act. Therefore, Winback concludes, AT&T's argument more properly is made to Congress rather than to the courts.[10] It relies for this

---

[10]. It does not appear that Winback raised this argument before the district court. The district court noted that "[Winback] and

proposition on Central Bank, a recent Supreme Court case refusing to find parties liable for aiding and abetting the violation of a federal securities statute.

In Central Bank, the Supreme Court considered whether section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), which has been held to create a private cause of action against parties who "commit a manipulative or deceptive act in connection with the purchase of or sale of securities . . . extends as well to those who do not engage in the manipulative or deceptive practice but who aid and abet the violation." Id. at ____, 114 S.Ct. at 1443. Examining the language of the statute, as well as the Court's own tendency to construe narrowly the scope of conduct prohibited by the Exchange Act, the Court concluded that an action cannot be maintained for aiding and abetting securities fraud: "[T]he statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act [and this] proscription does not include giving aid to a person who commits a manipulative or deceptive act." Id. ____, 114 S.Ct. at 1148.
(..continued)
Inga do not dispute the applicability of the common law of agency." Winback, 851 F. Supp. at 624. On this appeal, however, Winback states that "[i]t is the position of the defendants that the Lanham Act permits neither vicarious liability nor aiding and abetting liability." Appellee's brief at 34. It also writes: "The statute covers only primary liability. It does not include vicarious liability, respondeat superior liability or aiding and abetting liability. The defendants have not been accused personally of violating the statute and cannot be held liable under it. This case is as simple as that." Id. at 37. At oral argument, Winback explicitly made this argument. AT&T does not contend that Winback waived this argument by failing to raise it before the district court. Thus, we address it on the merits.

The language of <u>Central Bank</u> is undeniably broad, and the dissent warned that other mechanisms of common law secondary liability -- such as "respondeat superior and other common-law agency principles" -- may not survive the majority's construction of Section 10(b) of the Exchange Act. <u>Id.</u> at ____, 114 S.Ct. at 1460 n.12 (Stevens, J. dissenting). Nonetheless, we do not believe that the Court's restrictive reading of the Exchange Act impacts on the determination of the scope of liability under the Lanham Act.

In <u>Central Bank</u>, the Supreme Court primarily was concerned with broadening the range of unlawful conduct beyond that specifically proscribed by the Act. As the Court framed the issue, aiding and abetting constituted a separate cause of action, and in order to find such liability, the Court would have to imply a private right of action under the statute beyond that which already had been implied. <u>See id.</u> at ____, 114 S.Ct. at 1447 ("statutory text controls the definition of conduct covered by § 10(b) [and] 'the language of Section 10(b) does not in terms mention aiding and abetting.'") (quoting Brief for Securities and Exchange Commission as <u>Amicus Curiae</u> at 8). Thus, the Court saw the case as involving another in a series of attempts by plaintiffs and the SEC to broaden the statute to prohibit conduct simply not covered by the actual statutory language. <u>See, e.g.,</u> <u>Chiarella v. United States</u>, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118 (1980) ("When an allegation of fraud [under section 10(b)] is based upon nondisclosure, there can be no fraud absent a duty to speak"); <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 476, 97

S.Ct. 1292, 1302 (1977) (statute does not prohibit "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure" because such an act is not manipulative or deceptive conduct); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384-85 (1976) (refusing to expand scope of liability under section 10(b) of Securities Exchange Act beyond knowing or intentional misconduct). Once again, the Court simply refused to expand "the scope of conduct prohibited by the statute." Central Bank, ____ U.S. at ____, 114 S.Ct. at 1453.

The Supreme Court's wariness therefore rested on the nature of aiding and abetting liability itself. And in fact, aiding and abetting liability is not a well-settled mechanism for imposing civil liability. Rather, "[a]iding and abetting liability traditionally applies to criminal offenses", see Electronic Lab. Supply Co., 977 F.2d at 805; Petro-Tech, 824 F.2d at 1356. While it has been borrowed in certain civil contexts, "[p]recedent, except in the securities area, is largely confined to isolated acts of adolescents in rural society." Halberstam v. Welch, 705 F.2d 472, 489 (D.C. Cir. 1983) (also quoted in Central Bank, ____ U.S. at ____, 114 S.Ct. at 1450). This is because aiding and abetting liability, with its focus on the defendant's substantial and knowing assistance to the commission of a tort, rests by definition upon acts that encourage a tort rather than acts constituting the tort. See, e.g., Halberstam, 705 F.2d at 481-86 (canvassing aiding and abetting tort cases). By definition then, the act rendered unlawful under an aiding and

abetting theory is different than the act rendered unlawful by the underlying tort.

By contrast, courts imposing liability on agency theories are not expanding the category of affirmative conduct proscribed by the relevant statute; rather, they are deciding on whose shoulders to place responsibility for conduct <u>indisputably proscribed</u> by the relevant statute. The principal is held liable not because it committed some wrongdoing outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its <u>status</u> merits responsibility for the tortious actions of its agent. <u>Cf.</u> <u>Petro-Tech, Inc.</u>, 824 F.2d at 1356-58 (discussing aiding and abetting and vicarious liability separately).[11] Indeed, in some instances, liability cannot be imposed without reference to agency principles -- a corporation can only act through its agents, and therefore only can be bound through application of agency principles.

---

[11]. Prosser and Keeton have this to say in a discussion of the basis for vicarious liability:

> Since B himself has been free from all fault, when he is held liable to C it is in one sense a form of strict liability. In another it is not. The foundation of the action is still negligence, or other fault, on the part of A; and all that the law has done is to broaden the liability for that fault by imposing it upon an additional, albeit innocent, defendant. It is still an action for negligence, and the ordinary rules of negligence liability are still applied to it.

W. Page Keeton, Prosser & Keeton on Torts, § 69 at 499 (5th ed. 1984) (hereinafter Prosser & Keeton on Torts). In the context of cases like this one, the status of the defendant is of one who has authorized another to conclude contracts with third parties and who directly profits from those contracts.

Moreover, unlike aiding and abetting liability, which in the federal system largely has been confined to securities fraud, agency doctrine, including the theory of apparent authority, has long been a part of the federal system.  As long ago as 1928, the Supreme Court applied as a matter of federal common law general principles of agency law.  In so doing, it held that "few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own." Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 356, 49 S.Ct. 161, 162-63 (1929).  More recently, in American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp., the Supreme Court began its analysis of whether apparent authority applies in the antitrust context with the premise that "[t]he apparent authority theory has long been the settled rule in the federal system." Hydrolevel, 456 U.S. at 567, 102 S.Ct. at 1943 (citing Ricketts v. Pennsylvania R.R. Co., 153 F.2d 757, 759 (2d Cir. 1946)).[12]

---

[12]. The Court stated:

> In a wide variety of areas, the federal courts . . . have imposed liability upon principals for the misdeeds of agents acting with apparent authority.  See, e.g., Dark v. United States, 641 F.2d 805 (9th Cir. 1981) (federal tax liability); National Acceptance Co. v. Coal Producers Assn., 604 F.2d 540 (7th Cir. 1979) (common-law fraud); Holloway v. Howerdd, 536 F.2d 690 (6th Cir. 1976) (federal securities fraud); United States v. Sanchez, 521 F.2d 244 (5th Cir. 1975) (bail bond fraud), cert. denied, 429 U.S. 817, 97 S.Ct. 59 (1976); Kerbs v. Fall River Industries, Inc., 502 F.2d 731 (10th Cir. 1974) (federal securities fraud); Gilmore v.

In Hydrolevel, the Supreme Court followed the approach of the Restatement (Second) of Agency, and held that "a principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." Id. at 566, 102 S.Ct. at 1942 (citing Restatement (Second) of Agency §§ 249, 262 (1957); Rutherford v. Rideout Bank, 80 P.2d 978 (Cal. 1938)).

More recently, following earlier precedents, we have recognized respondeat superior liability under Title VII of the Civil Rights Act of 1964. Spain v. Gallegos, 26 F.3d 439, 450 (3d Cir. 1994). See also Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir.) ("an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship"), cert. denied, ____ U.S. ____, 114 S.Ct. 2693 (1994). And "[f]ederal courts have routinely applied [respondeat superior] principles in fair housing cases and held principals liable for the discriminatory acts of their agents." City of Chicago v. Matchmaker Real Estate Sales Center, Inc., 982 F.2d 1086, 1096 (7th Cir. 1992), cert. denied, ____ U.S. ____, 113 S.Ct. 2961 (1993); see also Northside Realty Assocs. Inc. v.

(..continued)
Constitution Life Ins. Co., 502 F.2d 1344 (10th Cir. 1974) (common-law fraud).

Hydrolevel, 456 U.S. at 568, 102 S.Ct. at 1943.

<u>United States</u>, 605 F.2d 1348, 1353-54 (5th Cir. 1979).  Thus,

<u>Central Bank</u>'s discussion of aiding and abetting should not be

transplanted into the more settled realm of agency law.[13]

But beyond this, it is quite clear under <u>Central Bank</u>'s

reasoning, the Supreme Court was concerned with the Exchange Act

itself under which the private right of action already had been

judicially implied.  Accordingly, we think that the Court did not

intend to overrule settled constructions of other statutes that

relied on common law doctrines to determine the scope of

liability.  <u>See</u> <u>Central Bank</u>, \_\_\_\_ U.S. at \_\_\_\_, 114 S.Ct. at

1444 ("we pa[y] close attention to the statutory text in defining

the scope of conduct prohibited by § 10(b)").  Thus, in contrast

to the Court's restrictive reading of the Exchange Act, the Court

has endorsed and applied a theory of secondary liability for

trademark infringement that comes very close to aiding and

abetting.  The Court first enunciated the rule over 70 years ago,

prior to the enactment of the Lanham Act, when the Court was

concerned with constructing and enforcing a common law of unfair

competition.  <u>William R. Warner & Co. v. Eli Lilly & Co.</u>, 265

_____

[13].  Winback also relies on <u>Monell v. Dep't of Social Servs. of City of New York</u>, 436 U.S. 658, 98 S.Ct. 2018 (1978), which held that a municipality could not be held liable under 42 U.S.C. § 1983 under a theory of <u>respondeat superior</u> liability.  That case is clearly inapposite.  There, the Court relied not just on the language of the statute, but the scheme of causation that must be proven in order to hold a party liable.  Moreover, the Court relied heavily on the legislative history and the fact that "creation of a federal law of <u>respondeat superior</u> would have raised all the constitutional problems associated with the obligation to keep the peace, an obligation Congress chose not to impose because it thought imposition of such an obligation unconstitutional."  <u>Id.</u> at 693, 98 S.Ct. at 2037.

U.S. 526, 44 S.Ct. 615 (1924). In that case, the Court held that a manufacturer of a pharmaceutical product could in certain instances be held liable for acts of infringement by distributors and retailers of the product. Relying on the general proposition that "[o]ne who induces another to commit a fraud and furnishes the means of consummating it is equally guilty and liable for the injury," id. at 530-31, 44 S.Ct. at 617 (citing Hostetter Co. v. Brueggeman-Reinert Distilling Co., 46 Fed. 188, 189 (C.C.D. Mo. 1891)), the Court reached what it saw as a self-evident conclusion: an entity is liable for trademark infringement if it contributes to the infringement. The theory of "contributory infringement", as it came to be called, survived into the statutory era. As the Supreme Court explained in a case involving section 32 of the Lanham Act:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854, 102 S.Ct. 2182, 2188 (1982). "The two elements for contributory infringement are thus summed up as (1) supply of a product, and (2) knowledge of direct infringement." Fonovisa, Inc. v. Cherry

Auction, Inc., 847 F. Supp. 1492, 1498 (E.D. Cal. 1994). Of course, there is no reason why the doctrine should be confined in application to manufacturers, and indeed, other courts have expanded it beyond that particular origin. See, e.g., Mini Maid Servs. Co. v. Maid Brigade Sys., Inc., 967 F.2d 1516, 1522 (11th Cir. 1992) (doctrine could hold franchisor liable for infringing actions of its franchisee when "franchisor explicitly or implicitly encouraged the trademark violations"); Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992) (landlord of flea market could be liable for its tenant's sale of an infringing product where the landlord is found to have been "wilfully blind" to the infringing acts); but see Fonovisa, 847 F. Supp. at 1498 (refusing to apply doctrine of contributory infringement "to impose liability on third parties who have never had a traditional role in enforcing the Lanham Act").[14]

### 3. Is there agency liability under section 43(a)?

The question, then, is whether application of agency theory, including the doctrine of apparent authority, would

---

[14]. If the doctrine of contributory infringement were the sole means of imposing liability for indirect conduct, AT&T would be without a section 43(a) remedy in this case. As the district court recognized, AT&T is not proceeding under a contributory infringement theory. Nor does it appear that it could. The record adequately supports the district court's conclusion that "in the instances where [AT&T] brought objectionable acts of the sales representatives to the attention of Inga, Inga took appropriate steps to reprimand and discipline the sales representative." Winback, 851 F. Supp. at 631.

further the goals of the statute.  See, e.g., Hydrolevel, 456 U.S. at 570, 102 S.Ct. at 1944.  In Hydrolevel, the Court, finding that "under general rules of agency law, principals are liable when their agents act with apparent authority and commit torts analogous to the antitrust violation presented by this case", simply looked at the policy behind the antitrust laws to determine whether the doctrine should be applied.  Id. at 565-66, 570, 102 S.Ct. at 1942, 1944.  Because "apparent authority theory is consistent with the congressional intent to encourage competition", the Court applied the doctrine.  Id.

The contributory infringement cases cited above demonstrate that in certain instances, secondary, indirect liability is a legitimate basis for liability under the federal unfair competition statute.  There is a good reason for this: the Lanham Act is derived generally and purposefully from the common law tort of unfair competition, and its language parallels the protections afforded by state common law and statutory torts.  Thus, the conduct prohibited by section 43(a) of the Lanham Act is even more analogous to common law torts than the antitrust laws at issue in Hydrolevel.  The Act federalizes a common law tort.  In construing the Act, then, courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability.  See, e.g., Electronic Lab. Supply Co., Inc., 977 F.2d at 806 (section 34(d)(11) of Lanham Act is like a "tort" statute); Hard Rock Cafe, 955 F.2d at 1148 (trademark infringement is a "species of tort" and "we . . . have turned to the common law to guide our

inquiry into the appropriate boundaries of liability"); David Berg and Co. v. Gatto Int'l Trading Co, Inc., 884 F.2d 306, 311 (7th Cir. 1989) ("unfair competition and trademark infringement are tortious"); 3 McCarthy on Trademarks § 25.03[1] at 25-34 ("trademark infringement and unfair competition are torts"). We previously have held that the "federal law of unfair competition under § 43(a) is not significantly different from the New Jersey [common] law of unfair competition" and have applied the identical test to both claims. American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1141 (3d Cir. 1986); see also American Home Prods. Corp. v. Barr Lab., Inc., 656 F. Supp. 1058, 1061 (D.N.J. 1987) (same), aff'd, 834 F.2d 368 (3d Cir. 1987). Other courts have ruled similarly. See, e.g., Words & Data, Inc. v. GTE Communications Servs., Inc., 765 F. Supp. 570, 579 (W.D. Mo. 1991) ("Missouri common law regarding unfair competition is coextensive with federal law"); Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) ("an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act"). Therefore, because section 43(a) parallels state tort law and is derived from tort common law, it is self-evident that application of at least some tort concepts of liability will "advance the goals of [the Act]." Petro-Tech, Inc., 824 F.2d at 1356.

Applying the analysis to the facts of this case, it is clear that liability based on agency principles is often

appropriate.[15] The Lanham Act has the broad purpose of "protect[ing] . . . competitors from a wide variety of misrepresentations of products and service . . . ." 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 91 n.13 (2d Cir. 1984), cert. denied, 470 U.S. 1052, 105 S.Ct. 1755 (1985). By expressly creating a private right of action against the infringer, the Act creates a "statutory tort of broad[] scope" that "provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's [misrepresentations]". Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 227, 230 (3d Cir. 1990). Here, the parties recognize that AT&T has the right to sue the sales representatives under section 43(a). But, as Winback acknowledges, "it would be inconvenient for AT&T to initiate suit in separate jurisdictions against every independent contractor which it believes violated its intellectual property rights." Appellee br. at 13-14. The only feasible way for AT&T to assert its federal rights would be to sue the principal, who, if an agency relationship is established, is able to exercise at least some control over its agents, who authorized the sales representatives to enter into contracts on its behalf, and who receives direct financial benefits from those

_____

[15]. The one case we have found that addresses this issue held without analysis (and apparently without dispute) that a principal could be held liable for the infringing acts of its agent acting with apparent authority. See Dreamwerks Prod. Group, Inc. v. Party Masters, Inc., Br. No. 91-22949, 1992 Bankr. LEXIS 711 at * 47-48 (N.D. Ill. April 23, 1992).

contracts.  If the Act prohibited such liability, then infringing actions would continue undeterred, a company would benefit from undeterred unlawful acts, and the statute's purpose to prohibit unfair competition would go unrealized.  "'[I]t would be unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment and the frailties of those working under his direction and for his benefit.'"  Petro-Tech, 824 F.2d at 1358 (quoting Restatement (Second) of Agency § 219, comment (a) on subsection (1)).

Thus, we hold that the district court properly held that agency principles apply to the instant dispute. Nonetheless, our review of the record compels the conclusion that the district court erred by failing adequately to consider the various theories of agency under which Winback could be responsible for the torts of its representatives.  In particular, the district court should have considered (1) whether Winback is liable for its representatives' acts, despite the fact that the representatives are independent contractors and despite the absence of a master-servant relationship; and (2) whether the representatives, even if not agents, were acting with the apparent authority of Winback.

## 4.  Agency law

We now apply agency law to the facts of this case.[16] "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." Sears Mortgage Corp. v. Rose, 634 A.2d 74, 79 (N.J. 1993) (citing Arcell v. Ashland Chem. Co., 328 A.2d 53, 65 (N.J. Law Div. 1977); 2A C.J.S. Agency § 37 (1972); Restatement (Second) of Agency § 1 (1958)). Depending upon the right of control capable of being exercised by the principal over the agent, agents are characterized either as servants or independent contractors. Servants generally are

---

[16]. This inquiry, though, raises an additional question, of what law to examine. Courts addressing Section 43(a) of the Lanham Act have looked both to the common law of the state where the infringing action took place, and to general principles of federal common law. See, e.g., Hard Rock Cafe, 955 F.2d at 1148 ("we have . . . turned to the common law to guide our inquiry into the appropriate boundaries of liability"); Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 16 (2d Cir. 1988) (declining to find right of contribution under the Lanham Act because "[t]here is no federal common law of contribution"), cert. denied, 490 U.S. 1006, 109 S.Ct. 1642 (1989).

In W.T. Rogers Co., Inc. v. Keene, 778 F.2d 334 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit phrased the problem as follows: If the Lanham Act provides simply "a federal remedy for unfair competition", the court should apply the common law of the relevant state. If, however, the Act is interpreted as creating "a federal substantive law of unfair competition", then the suit is "to enforce a federal common law trademark, and the court is not bound to follow the common law of a particular state." Id. at 338. But in Rogers the court did not resolve the question. Because of uniformity concerns implicated by applying different law to identical claims, depending on the state where the complaint is filed, we are inclined to favor application of general principles of federal common law. Nonetheless, we need not decide this issue today, because in the doctrinal areas relevant to this case, New Jersey law is in accord with general principles of common law.

employees of the principal, and are subject to physical control by the principal. As one court has explained the distinction:

> 'An agent is a person who represents another in contractual negotiations or transactions akin thereto. A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants.'

Sanders v. Rowan, 484 A.2d 1023, 1028 (Md. Ct. Sp. App. 1984) (quoting Globe Indem. Co. v. Victill Corp., 119 A.2d 423, 427 (Md. 1956)). Thus, if "'the employer assumes the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract,'" a master-servant agency relationship has been created. Stewart v. Midani, 525 F. Supp. 843, 845 (N.D. Ga. 1981) (applying Georgia law) (quoting Blair v. Smith, 41 S.E.2d 133, 135 (Ga. 1947)). If, however, the agent is not subject to that degree of physical control, but is only subject to the general control and direction by the principal, the agent is termed an independent contractor. Id. at 846; see also Nazworth v. Swire Florida, Inc., 486 So.2d 637, 638 (Fla. Dist. Ct. App. 1986) ("'independent contractor' is a term which is antithetical to the word 'servant', although not to the word 'agent'") (quoting Restatement (Second) Agency section 14(N), Comment (a)). Thus, all agents who are not servants are "independent contractors." Moreover, all non-agents who contract to do work for another are also termed "independent

contractors".  For example, a person who contracts to build a swimming pool for another is the latter's independent contractor. There are, then, agent-independent contractors and non-agent independent contractors.

Such distinctions matter because the scope of the employer's liability for the torts of its representatives depends almost exclusively on how the relationship is characterized.  "If the principal is the master of an agent who is his servant, the fault of the agent, if acting within the scope of his employment, will be imputed to the principal by reason of respondeat superior."  Baldasarre v. Butler, 625 A.2d 458, 464 (N.J. 1993) (emphasis added) (quoting JMB Enter. v. Atlantic Employers Ins., 550 A.2d 764, 767 (N.J. Super. Ct. App. Div. 1988)).  On the other hand, "the principal [generally] is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them."  Baldasarre, 625 A.2d at 465 (emphasis added); Sanders, 484 A.2d at 1028-29 ("where the agent is not a servant, the principal is not liable for the agent's negligent conduct 'unless the act was done in the manner authorized or directed by the principal, or the result was one authorized or intended by the principal.'") (citations omitted); Nazworth, 486 So.2d at 638 ("The general rule . . . is that an owner, employer, or contractee will not be held liable for the torts of an independent contractor or of the latter's employees committed in the performance of the contracted work.") (citations omitted).  As the New Jersey Supreme Court has explained, the independent contractor is "'characterized by the attributes of

self-employment and self-determination in the economic and professional sense'".  Baldasarre, 625 A.2d at 465 (quoting Rokos v. State, Dep't of Treasury, 564 A.2d 1217, 1220 (N.J. Super. Ct. App. Div. 1989)).  Since the employer

> 'has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer is the proper party to be charged with the responsibility for preventing the risk, and administering and distributing it.'

Baldasarre, 625 A.2d at 465 (quoting Prosser and Keeton on Torts, § 71).

The district court found that the sales representatives are independent contractors and therefore Winback could not be liable for their infringing acts.  AT&T's arguments against this finding can be summed up as follows:  (1) the district court erred by failing to categorize the sales representatives as employees or servants of Winback; (2) the district court failed to consider whether the representatives were agent independent contractors or non-agent independent contractors; (3) the district court failed to consider whether Winback had created an apparent master-servant relationship such that Winback should be held liable for the torts of its sales representatives; (4) Winback should be held liable at any rate.  We will address these arguments in turn.

## a.  Servants or independent contractors

In reaching its conclusion that Winback's sales representatives are independent contractors, the district court relied almost exclusively on Baldasarre.  In that case, the plaintiff had sought to hold a purchaser of land liable for his attorney's alleged misrepresentations.  In denying relief, the Supreme Court of New Jersey reasoned:

> Attorneys generally are not subject to their clients' actual control or direction. Indeed, most clients have an attorney because they are unfamiliar with the law and want an attorney to guide them through the intricacies of that field.  As professionals, attorneys are deemed responsible for their own acts, and, as in this case, most clients have legal recourse against the attorney and his law firm for their actions.

Baldasarre, 625 A.2d at 465.  Therefore, the Court concluded that "[a]n innocent client should not be held vicariously liable for the wrongful conduct of his or her attorney against the attorney's other clients if the client does not direct, advise, consent to or participate in the attorney's improper conduct." Id. at 465.  The district court in this case analogized as follows:

> [T]he level of joint activity between [Winback] and Inga and the sales representatives is similarly minimal and peripheral to the nuts and bolts of the business of marketing and promoting. Furthermore, as detailed above, no proof was submitted to the Court to establish that [Winback] or Inga advised, consented to or participated in the alleged misrepresentations.  Accordingly, plaintiff has failed to establish sufficient proof that the sales representatives are any more than independent contractors.

851 F. Supp. at 626.

We hold that the district court correctly concluded that the sales representatives are independent contractors. The district court found that Winback employs no marketing employees on its own, and that the sales representatives "play an integral role in the success of [Winback], financially and otherwise, in that all sales are conducted through these agencies and individuals." 851 F. Supp. at 626. Nonetheless, the district court correctly recognized that Winback exercises minimal control over the manner in which the representatives perform their work, and no control at all even over whether the representatives choose to market their company. Moreover, the representatives work for any number of companies at the same time, are paid purely based on the results they obtain, and operate their own businesses with their own expenses. The fact that Winback attempted to police the representatives to prevent misrepresentations does not change our result. "[A]n employer does not transform an independent contractor into a servant merely because he wishes to supervise the project as it transpires." Brady v. Ralph Parsons Co., 520 A.2d 717, 731 (Md. 1987).

Therefore, the district court properly found that the sales representatives were independent contractors. However, the court erred by stopping at that point. The district court failed

to determine whether the sales representatives were agent-
independent contractors or non-agent independent contractors.[17]

---

[17]. The district court's failure to address this question is
understandable in light of Baldasarre, for the case does not set
forth explicitly the distinctions on which it relies.  A close
reading of the case reveals, however, that the Supreme Court of
New Jersey did not intend to eviscerate the distinction between
agent-independent contractors and non-agent independent
contractors.  For example, the Court quotes Prosser and Keeton on
Torts for the proposition that an employer who hires an
independent contractor:

> 'has no right of control over the manner in
> which the work is to be done, it is to be
> regarded as the contractor's own enterprise,
> and he, rather than the employer is the
> proper party to be charged with the
> responsibility for preventing the risk, and
> administering and distributing it.'

Baldasarre, 625 A.2d at 465 (quoting Prosser and Keeton on Torts,
§ 71).  But Prosser and Keeton rely in turn on the Second
Restatement of Agency for their liability proposition, and the
authors recognize that there are agent-independent contractors
and non-agent independent contractors:

> Since an agent who is not a servant is not
> subject to any right of control by his
> employer over the details of his physical
> conduct, the responsibility ordinarily rests
> upon the agent alone, and the principal is
> not liable for the torts which he may commit.
> There are, however, a number of situations in
> which such liability  may exist.  These
> include cases in which a tort may be based
> upon the apparent authority of the agent to
> act for his principal, or in which a tort
> such as deceit occurs in the course of a
> consensual transaction between the agent and
> the injured person.  Thus . . . a seller of
> land or goods may, in most states, be subject
> to an action of deceit for the fraud of his
> agent committed in the course of the sale.

Prosser and Keeton on Torts, § 70 at 508 (citing, among other
authorities, numerous sections of the Restatement (Second) of

### b.   Agent-independent contractors?

In this regard, we first must address the scope of the district court's findings.  Although the district court appeared to conclude that the representatives are non-<u>agent</u> independent contractors, a close reading of the decision reveals that the court actually found only that the representatives were non-<u>servant</u> independent contractors.  For one thing, the court referred to "the distinctions between employees or agents and non-employees or independent contractors," implying that once a representative is termed an independent contractor it is by

(..continued)
Agency) (footnotes omitted).  Prosser and Keeton again cite the Restatement (Second) of Agency's proposition that

> A principal is subject to liability for loss
> caused to another by the other's reliance
> upon a tortious representation of a servant
> <u>or other agent</u>, if the representation is:
>
>      (a) authorized;
>      (b) apparently authorized; or
>      (c) within the power of the agent to
>      make for the principal.

Second Restatement § 257 at 558 (cited in Prosser and Keeton, § 70, n.70).

Moreover, to the extent that <u>Baldasarre</u> can be read to hold that independent contractors may never bind principals for their torts, that proposition was eviscerated the very next year by the same court.  In <u>Sears Mortgage Corp.</u>, the Supreme Court of New Jersey held a title insurance company responsible for its attorney's fraud.  The Court directly relied on agency principles.  <u>Sears Mortgage Corp.</u>, 634 A.2d at 83-84.  Since it can in no way be argued that the attorney was the title insurer's servant, the Court implicitly recognized the category of agent-independent contractors.

definition a non-agent.  Winback, 851 F. Supp. at 626.  Moreover,

in determining that the representatives were independent

contractors, the court used precisely the factors normally used

to distinguish between servants and independent contractors:  the

principal's right of physical control, the place where the

representatives work, the method of payment, the fact that the

representatives had their own business enterprises.  See Warren

A. Seavey, Agency, § 84 at 142 (1964) (hereinafter "Seavey")

("the relation of master and servant is indicated by the fact

that the employee is given a salary and is employed for a

considerable period; that he is using an instrumentality of the

principal on his premises; that the work is unskilled, usually

supervised; that the one employed does not have a distinct

business").

    The district court's failure to make the additional

finding is crucial, because while generally principals are not

liable for the torts of their independent contractors, the common

law is littered with exceptions:

> [T]here is a range of tortious conduct on the
> part of an agent that may bind the principal
> and subject him to liability even where the
> agent is not a servant, where the act was not
> done in the manner authorized or directed by
> the principal, and where the result was not
> authorized or intended by the principal.

Sanders v. Rowan, 484 A.2d at 1029.  A principal is not generally

liable for physical torts committed by its independent

contractor-agent, but a principal will be held liable for the

independent contractor-agent's misrepresentations "upon matters

which the principal might reasonably expect would be the subject
of representations, provided the other party has no notice that
the representations are unauthorized." Id. at 1029 (quoting
Restatement (Second) of Agency § 258); see also Nagels v.
Christy, 330 S.W.2d 754, 757 (Mo. 1959) (principal liable for
misrepresentations by independent contractor sales agent) (citing
cases).  As one commentator has written:

> Where an agent is authorized or apparently
> authorized to conduct a transaction, and the
> other party is unaware of any limitation upon
> the agent's authority, a problem similar to
> that of the limits of the scope of employment
> by a servant arises.  The difficulties are
> best seen in the cases of selling agents.
> Their principals have been held liable for
> the unauthorized and untrue statements as to
> the capacity of the machine sold, the age of
> a second-hand automobile, the construction
> and material used in building a house, the
> income from property, the amount of taxes due
> upon it, the extent of coverage of insurance,
> the intent of the manufacturer not to disturb
> a distributorship awarded by it to the
> plaintiff.

Seavey, § 92 at 163.  Although liability at common law generally
was limited to actions by the purchaser for deceit, we see no
reason why the doctrine should not be transplanted to the area of
unfair competition.  The basis for the common law exception is
the injustice in allowing a principal to place agents in the
marketplace, to allow the agents to complete contracts on the
principal's behalf, to profit from the agents'
misrepresentations, and then to disclaim liability for the
agents' actions while benefitting from the fraud.  The theory
relies on the distinction between torts of misrepresentation that

benefit the defendant, and torts such as negligently injuring a passerby while driving a car, from which the defendant does not profit at all. Moreover, as the New Jersey Supreme Court has noted, it is appropriate for courts to consider "awareness of the risk and the element of foreseeability of loss in their consideration of liability based on agency principles." Sears Mortgage Corp., 634 A.2d at 83. Correctly characterized, then, the doctrine simply states a circumstance in which the principal justly is held responsible for the torts of its independent contractor-agent.

We hold, then, that when a principal authorizes its independent contractor agent to conduct and conclude a transaction with third parties on the principal's own behalf, and the principal benefits financially from the contracts, the principal will be liable in an action brought pursuant to section 43(a) of the Lanham Act based on the agents' foreseeable infringing actions upon which it would be reasonable for the third party to rely, provided the third party has no notice that the representations are unauthorized.[18]

Of course, it would be unfair for a principal to be liable for all misrepresentations of its agent independent contractors. Thus, we include the requirements that the

---

[18]. As noted above, the Restatement holds a principal liable for tortious representations that are authorized or apparently authorized. See n.17 supra. We believe that this terminology unnecessarily confuses the issues. Therefore, we employ Seavey's approach and the approach of the New Jersey Supreme Court in Sears Mortgage Corp. and use the concept of foreseeability. See typescript at 43-44 (quoting Seavey).

misrepresentations be foreseeable and that reliance be reasonable. In considering whether the infringing actions were foreseeable, the district court should consider all of the surrounding circumstances. For instance, if the principal went to great lengths to ensure that the agents knew not to make certain representations, such representations, if made, may be found to be unforeseeable. But if, at the same time, the principal gave the agents carte blanche to hold themselves out as the principal itself, then such infringing actions may become foreseeable, notwithstanding the principal's efforts at policing the agents. The point, of course, is to hold the principal liable when it is just to do so, but still to encourage the principal to police the agents enough so as to avoid liability. This is the type of balancing the district court must undertake in the first instance.

Professor Seavey's cautionary observations about reliance are also apt:

> It is difficult to suggest a limitation upon the power of a selling agent to bind the principal if the statements are relevant to the transaction which the agent is authorized to conduct. . . A working rule would be the limitation of liability to statements concerning matters as to which the principal might think the agent, or any agent, might misrepresent in forwarding their joint interests. There must be limits. The seller of a New England farm should not be liable to a credulous buyer for tort damages if the agent were to represent that the land to be sold contained oil or gold.

Seavey, § 92 at 164.

Because the district court failed to address whether the representatives were agents or non-agents, and therefore failed to consider these questions, we must remand the case for further fact findings and renewed application of the law to the facts. Upon remand, then, the district court first must determine whether the sales representatives were agent-independent contractors or non-agent independent contractors. The Restatement defines a non-agent independent contractor as follows:

> A person who contracts to accomplish something for another or to deliver something to another, but who is not acting as a fiduciary for the other is a non-agent contractor. He may be anyone who has made a contract and who is not an agent. The term is used colloquially to describe builders and others who have contracted to accomplish physical results not under the supervision of the one who has employed them to produce the results.

Restatement (Second) Agency § 14N, Comment (b). Thus, the district court should assess whether the representatives are analogized better to a firm that contracts to perform a particular, discrete task, such as to build a swimming pool, or to a party who is empowered to speak for another and bind the other in contracts. In making this determination, the facts analyzed by the district court and adduced at the hearing are certainly relevant. While the district court should focus on the level of control exercisable by Winback over the manner in which the sales representatives market its product, it should not emphasize physical control (as it properly did in considering

whether the representatives were servants).  Inga's testimony
that he attempts to police the representatives is certainly
relevant to this inquiry, particularly if Winback authorizes the
agents to represent themselves as Winback.[19]  If the district
court finds that the sales representatives are agents, it then
must proceed to determine whether they committed infringing acts
and whether, under the test we detailed above, Winback and Inga
may be held liable.  If the district court determines that the
representatives are non-agent independent contractors, it still
must consider whether they were acting with apparent authority to
make the representations.


### c.  Apparent authority

The district court did not consider whether the sales
agents were acting with apparent authority, or as apparent
servants.  The district court discounted AT&T's arguments because
it believed that the doctrine of apparent authority only comes
into play when an actual agency relationship is established.
Winback, 851 F. Supp. at 629.  The district court's premise was
incorrect.  "Apparent authority arises in those situations where

---

[19].  It could be argued that our decision encourages parties like
Winback to exercise as little control as possible over their
representatives.  We see little danger of that, though.  For one
thing, we cannot conceive that in a situation where the
representative is empowered to speak as the principal, where the
representative has the power to conduct and conclude
transactions, and where the principal inevitably will exercise
control over how its company is represented to third parties, a
non-agency relationship will be found.  Moreover, once an agency
is created, the principal may attempt to avoid liability by
acting in a manner that makes misrepresentations unforeseeable.

the principal causes persons with whom the agent deals to reasonably believe that the agent has authority" despite the absence of an actual agency relationship. Barticheck v. Fidelity Union Bank/First Nat'l State, 680 F. Supp. 144, 148-49 (D.N.J. 1988) (applying New Jersey law). As the Court of Appeals for the Sixth Circuit has explained:

> If the principal is responsible for the third person believing that the person with whom she deals is an agent, or if the principal should realize that his conduct is likely to induce such belief, then there is an agency created by apparent authority and the principal will be held responsible for the torts of his agent.

Roberts v. Montgomery Ward and Co., Inc., No. 83-1115, 729 F.2d 1462 at *3 (6th Cir. Feb. 24, 1984). In short, apparent authority may be a way of creating an agency relationship. Under the doctrine, liability is imposed "not as the result of the reality of a contractual relationship but rather because of the actions of a principal or an employer in somehow misleading the public into believing that the relationship or the authority exists." Arthur v. St. Peters Hosp., 405 A.2d 443, 446 (N.J. Super. Ct. Law Div. 1979). Thus, while "[the] doctrine generally presupposes the existence of a principal-agent relationship . . . it is not necessary to the application of the doctrine." Shadel v. Shell Oil Co., 478 A.2d 1262, 1264 (N.J. Super. Ct. Law Div. 1984); see also Sears Mortgage Corp., 634 A.2d at 79 ("[e]ven if a person is not an 'actual agent,' he or she may be an agent by virtue of apparent authority based on manifestations of that

authority by the principal.") (citing C.B. Snyder Realty Co. v. National Newark Banking Co., 101 A.2d 544, 548 (N.J. 1953)).

The fact, then, that Winback's sales representatives actually may have been non-agent independent contractors does not dispose of the question. Rather, "[a]ny inter se arrangement between [Winback and its sales representatives] establishing a relationship other than that of principal and agent is unimportant in determining the existence of apparent authority. The crucial question is what representations were made to the third party . . . ." Amritt v. Paragon Homes, Inc., 474 F.2d 1251, 1252 (3d Cir. 1973) (applying Virgin Islands law). Thus, although "when dealing with an independent contractor, no [master/servant] relationship exists, . . . this relationship is not necessary to the application of the doctrine." Arthur, 405 A.2d at 446.

Under the doctrine of apparent authority, the district court should have looked to the principal's actions and the third parties' reasonable beliefs. AT&T contends that Winback authorized its sales agents to conduct transactions as though they were Winback. If this is true, then the district court may find that Winback held its representatives out to the public as its servants or as itself, and that the third parties reasonably relied on that relationship in deciding to enter into contracts, and, therefore, that the misrepresentations were authorized by Winback. In other words, Winback may have created an agency under the theory of apparent authority, and Winback may be liable for the misrepresentations. Because the district court made no

findings in this regard, we must remand the case for additional fact-finding.[20]

### d. AT&T's final secondary liability argument

Finally, AT&T appears to argue that Winback should be liable as a matter of law for the torts of its sales representatives, regardless of whether they are agents and regardless of whether they acted with apparent authority. AT&T continually refers in its brief to the inequities of the district court's decision. But the law it cites to support this broad theory of secondary liability exists in copyright cases.[21] The

---

[20]. When a plaintiff relies on apparent authority, it also must establish that the third party relied on the agency relationship in making its purchasing decision. Sears Mortgage Corp., 634 A.2d at 82. In this regard, Winback argues that the representatives held themselves out as AT&T and not as Winback. The district court held that "[t]he proofs before the Court are extremely unclear as to whether or not the sales representatives hold themselves out to be [Winback] in making the solicitations or whether or not [Winback] knowingly permits its name to be used in the course of solicitations without qualification from the representatives that they are independent marketing agencies engaged to sell and promote the Winback program on behalf of [Winback]." Winback, 851 F. Supp. at 628 n.5. Because these questions are crucial in this case -- in order to determine not only reliance, but also the extent to which the principal held the representatives out to the public as its alter ego -- the district court may wish to hear additional evidence upon remand.

[21]. Along with citing the copyright cases, AT&T points to the Seventh Circuit Court of Appeals' decision in First Nat'l Bank of Cicero v. Lewco Sec. Corp., 860 F.2d 1407 (7th Cir. 1988). AT&T argues in its brief:

"As one Court said,

where the principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal

Court of Appeals for the Seventh Circuit has summed up the law in these cases as follows:

> [A] defendant is vicariously liable for copyright infringement if it has 'the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.' Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971); F.E.L. Publications, Ltd. v. National Conf. of Catholic Bishops, 466 F. Supp. 1034, 1040 (N.D. Ill. 1978); see also Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354, 355 (7th Cir. 1929) (owner of dance hall liable for copyright violations by band hired to entertain paying customers); Famous Music

(..continued)

> must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability.
>
> Courts have found an agent to be a sole actor for his principal when 'the whole procedure . . . was entrusted by [the principal] to the initiation and execution of the agent . . .'"

AT&T brief at 30 (quoting Cicero, 860 F.2d at 1417–18). AT&T continues: "Yet that is exactly what Winback has done here. Indeed, it is difficult to imagine a situation where a representative shoulders responsibility more completely for the promotional marketing of its principal than a Winback representative, for Winback's agents are entrusted with the entire marketing responsibility for Winback." AT&T brief at 30. AT&T fails to mention that the court's holding was predicated on a finding that the agent was an adverse agent. See Cicero, 860 F.2d at 1417 ("Where an adverse agent is also the sole representative of the principal in the transaction in question, the principal may . . . be charged with the agent's knowledge.") (citing 3 W. Fletcher, Corporations § 827 at 153–62 (1975)). The court explained that "[t]he adverse agent exception . . . comes into play where the agent's interests are shown to be adverse to those of his principal." Id. AT&T does not even attempt to argue that Winback's representatives were adverse agents; therefore, AT&T's reliance on Cicero is misplaced.

> Corp. v. Bay State Harness Horse Racing &
> Breeding Ass'n, 554 F.2d 1213, 1215 (1st Cir.
> 1977) (owner of racetrack liable for
> copyright violations by company hired to
> supply music over public address system).
> The purpose of the doctrine is to prevent an
> entity that profits from infringement from
> hiding behind undercapitalized 'dummy'
> operations when the copyright owner
> eventually sues. Shapiro, Bernstein, 316
> F.2d at 309.

Hard Rock Cafe, 955 F.2d at 1150. AT&T's theory would go well beyond agency theory, for it would not rely on situations where the agent is acting on behalf of the principal or as the principal's alter ego. AT&T's argument -- which attempts to have secondary liability under the Lanham Act parallel secondary liability under the copyright laws -- is remarkable in light of the fact that the Supreme Court has rejected precisely this argument. The Court explicitly has held that secondary liability for trademark infringement must be drawn more narrowly than secondary liability for copyright infringement. Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 439 n.19, 104 S.Ct. 774, 787 n.19 (1984). The Court made that statement while observing the "'fundamental differences between copyright law and trademark law.'" Id. (internal quotation and citations omitted). To adopt AT&T's argument would entail ignoring the Supreme Court's warning, and would require us to base secondary liability on a theory that goes beyond any common law doctrine of vicarious liability.[22] We decline to do so.

---

22. AT&T also argues that Winback should be held liable under the "joint tortfeasor" test enunciated in Hard Rock Cafe. In that case, the Court of Appeals for the Seventh Circuit held that

## 5.  Likelihood of confusion

The district court, in addition to holding that Winback could not be held liable for the acts of its sales agents, stated that "[t]he Court need not rest solely on its determination that the sales representatives are independent contractors in denying plaintiff's application."  Winback, 851 F. Supp. at 630.  Rather, while "plaintiff submitted sufficient proofs to the Court to establish that consumers have been confused by certain oral misrepresentations made by and written documents provided by the Winback sales representatives", nonetheless, "the proofs also establish that the cause of such confusion is not solely attributable to the sales representatives."  Id.  AT&T argues that the district court ignored unassailable evidence that customers were likely to be confused by the representations. Winback, relying on a recent case we decided, contends that the test is not "likelihood of confusion" but "actual confusion."

(..continued)
a party may be held liable for the tortious acts of another when "the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product."  955 F.2d at 1150.  AT&T's argument is meritless.  The essence of joint tortfeasor liability is fault -- "[j]oint tortfeasors are all persons who act in concert to commit a tort, pursuant to a common purpose."  McCarthy on Trademarks, §
25.03[1] at 25-35.  Winback and its representatives did not act pursuant to a common plan to commit the tortious act, and Winback did not actively take part in the tort, or induce or encourage the tort. Id.  Moreover, Winback and its representatives clearly: (1) are not partners, (2) do not have the authority to bind each other, and (3) do not exercise joint control over Winback's product.

Since, according to Winback, AT&T submitted insufficient statistical proofs of actual confusion, Winback contends that the district court's judgment should be affirmed on this alternative ground.

While both parties argue about whether the district court's finding was clearly erroneous, it appears that the district court actually made no such finding. The court states in its Opinion:

> The Court does not intend to suggest, however, that either the nature of the product or the arguably unwise decisions of the AT&T marketing department would justify acts of infringement by [Winback] or those who market the [Winback] product. Indeed, the Court makes no determination as to the primary cause of the actual confusion which was proven to exist. The Court only raises these issues to support its conclusion that the issuance of a preliminary injunction in this matter, which would require a finding of likelihood of confusion, would be improper given that certain decisions by the plaintiff played at lease some substantive role in the creation of the confusion.

Id. at 631 (emphasis added). Thus, the court actually refrained from finding for Winback on the likelihood of confusion test alone. Rather, it simply held that AT&T's contribution to the confusion supported the already-made decision that it was not entitled to injunctive relief.[23] Since the court did not make

---

[23]. Our reading of the Opinion is further corroborated by the fact that the court cited no case law in its discussion of likelihood of confusion and the fact that in another place in the Opinion, the court held that "[t]here is no question that [AT&T] submitted sufficient proofs to the Court to establish that consumers have been confused by certain oral misrepresentations made by and written documents provided by the Winback sales

any express finding in this regard, we will decline to weigh the evidence in the first instance.  Rather, upon remand, if the district court reaches this issue, it should make the appropriate findings.

Still, Winback argues that we should adopt the "actual confusion" standard we apply in claims of false advertising and that we should hold as a matter of law that AT&T's evidence does not satisfy the test.  In a claim of trademark infringement under the Lanham Act, "[p]roof of actual confusion is not necessary; likelihood of confusion is all that need be shown.'"  Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994) (quoting Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 292 (3d Cir.), cert. denied, ____ U.S. ____, 112 S.Ct. 373 (1991)).  In considering whether a plaintiff has demonstrated likelihood of confusion, district courts generally are to consider the following factors:

(1) the degree of similarity between the plaintiff's mark and the alleged infringing mark;

(2) the strength of the plaintiff's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of customers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion;

(..continued)
representatives."  851 F. Supp. at 630 (emphasis added).  See typescript at 11.

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) the extent to which the targets of the parties' sales efforts are the same.

Resorts Int'l, Inc. v. Greate Bay Hotel and Casino, 830 F. Supp. 826, 835 (D.N.J. 1992); American Home Prods. v. Barr Lab., 656 F. Supp. at 1068.  Of course, when the claim involves allegations beyond use of a similar mark, the test should be broadened accordingly.  Sun-Fun Prods., Inc. v. Suntan Research and Dev., Inc., 656 F.2d 186, 192 (5th Cir. 1981).

We apply a different test for claims of false advertising pursuant to 15 U.S.C. § 1125(a)(1)(B). A party seeking relief under this section of the Lanham Act

> bears the burden of proving actual deception
> by a preponderance of the evidence. . . .
> [I]t cannot obtain relief by arguing how
> consumers could react; it must show how
> consumers actually do react.

Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 228-29 (3d Cir. 1990); see also Johnson & Johnson-Merck v. Rhone-Poulenc Rorer, 19 F.3d at 130.[24]  Thus, the plaintiff must adduce evidence that "the public was actually misled or confused by it."  Fisons Horticulture, Inc., 30 F.3d at 472 n.8 (citing Johnson & Johnson-Merck, 19 F.3d at 129-30); Sandoz Pharmaceuticals Corp., 902 F.3d at 228-29.  "[T]he success of the claim usually turns on the persuasiveness of a consumer

---

[24].  If the plaintiff proves that the advertising is literally false, and not just misleading, then it need not prove actual deception.

survey." Johnson & Johnson-Merck, 19 F.3d at 129-30 (citation omitted). In Johnson & Johnson-Merck, we held that a survey demonstrating that 7.5% of consumers were deceived was insufficient to satisfy plaintiff's burden that the advertising "tends to deceive or mislead 'a substantial portion of the intended audience.'" Id. at 133-34 (quoting U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922 (3d Cir.), cert. denied, 498 U.S. 816, 111 S.Ct. 58 (1990)). If that test were applied to this case, unless the district court found that the defendants' representations were actually false, AT&T would be unable to meet the standard. Thus, the question is whether AT&T's claims against Winback and Inga are analogous enough to a claim of false advertising to warrant the same test.

AT&T's claims against the defendants can be divided into two categories: (1) Winback's representatives brazenly and falsely represented Winback to be, or to be a division of, AT&T; (2) Winback's representatives engaged in misleading representations, such as designating itself as the Winback and Conserve Program rather than the Winback and Conserve Program, Inc., that misled customers into believing that Winback was affiliated with AT&T. In some sense, AT&T's claims are analogous to claims of false advertising. See, e.g., 3 McCarthy, § 27.08[1](c) at 27-90 ("A variation on the false advertising prong of § 43(a) is presented in cases finding a violation in the false representation that a product is created, designed, or authorized by plaintiff.") (collecting cases). The similarity stems from

the fact that advertising is a subset of marketing, and AT&T takes issue with Winback's methods of marketing.

But all claims of unfair competition, including claims of trademark infringement, are to some degree related to claims of false advertising. They all involve allegations that the public was misled into purchasing a particular entity's product. But a Lanham Act claim of false advertising is different because in the usual such case, a plaintiff is claiming to be injured because of false representations by the defendant about the strength or quality of the defendant's own product. Thus, the plaintiff essentially is claiming relief based on an indirect injury. In a false designation of origin claim, however, the plaintiff claims relief because of false representations made by the defendant about the plaintiff's product. Thus, we previously have held that "[l]ikelihood of confusion is . . . the test for actions brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) for unfair competition to prevent false representations as to the source or origin of goods or services by a mark confusingly similar to one already in use." Fisons Horticulture, Inc., 30 F.3d at 473 (citing Sun-Fun Prods., Inc. v. Suntan Research & Dev. Inc., 656 F.2d at 192). We now adopt that test not only for false designation of origin claims that allege use of a confusingly similar mark, but also more general false designation of origin claims. See Universal Money Centers, Inc. v. AT&T, 22 F.3d 1527, 1529-30 (10th Cir. 1994) (test for false designation of origin claim is likelihood of confusion) (citing Jordache Enters., Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482,

1484 (10th Cir. 1987)) (<u>petition for cert. filed</u> Sept. 8, 1994); <u>Smith Fiberglass Prods., Inc. v. Ameron, Inc.,</u> 7 F.3d 1327, 1329 (7th Cir. 1993) (test for false designation of origin and palming off claim is "likelihood of consumers in the relevant market confusing the infringer's mark with that of the complainant"). <u>Cf.</u> <u>Conopco, Inc. v. May Dep't Stores Co.,</u> No. 92-1412, 1994 WL 511280 at *7 (Fed. Cir. Sept. 21, 1994) (noting, in different context, distinction between false advertising claim and false designation of origin claim). Therefore, we reject Winback's argument and decline to affirm the district court's Order on this alternative ground.

### III.  CONCLUSION

For all the reasons detailed above, we will vacate the district court's denial of AT&T's application for a preliminary injunction and we will remand the matter to the district court for further proceedings consistent with this Opinion.